**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James A. WHITE, Defendant-Appellant.**

**Nos. 16021, 16022.**

United States Court of Appeals Seventh Circuit.

Jan. 7, 1969.

Certiorari Granted April 7, 1969. See 89 S.Ct. 1305.

Chauncey Eskridge, William R. Ming, Jr., Chicago, Ill., Morris A. Shenker, John L. Boeger, Murry L. Randall, St. Louis, Mo., for defendant-appellant.

Thomas A. Foran, Edward V. Hanrahan, U. S. Attys., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee; Gerald M. Werksman, Robert J. Krajcir, Asst. U. S. Attys., of counsel.

Before CASTLE, Chief Judge, MAJOR, Senior Circuit Judge, and SCHNACKENBERG,[1] HASTINGS, KILEY, SWYGERT, FAIRCHILD, CUMMINGS, and KERNER, Circuit Judges.

SWYGERT, Circuit Judge.

The defendant, James A. White, was tried before a jury and convicted on seven counts of two consolidated indictments which charged him with certain narcotics violations arising under the provisions of 26 U.S.C. § 4705(a) and 21 U.S.C. § 174. The district court imposed a prison sentence of twenty-five years and fined the defendant $35,000.

A three-judge panel of this court, one judge dissenting, reversed the judgment of conviction. Subsequently, the Government's petition for a rehearing en banc was granted. Upon consideration of this cause by the entire court, we are of the opinion that our prior decision should be followed and that the district court's judgment of conviction must be reversed and the case remanded for a new trial.

The principal error relied upon by the defendant and the one which controls our disposition of this appeal was the admission into evidence of certain incriminating statements made by the defendant which were overheard by means of electronic eavesdropping by Government agents. This eavesdropping was accomplished by the placing of a radio kel set transmitter [2] on the person of a Government informer, Harvey Jackson, before he talked with White at various locations, including the defendant's home, automobile, and place of business, as well as the informer's home. At no time did the agents of the Federal Bureau of Narcotics secure a search warrant or court order authorizing such eavesdropping.

The Government's evidence tended to prove the following facts. On December 9, 1965, Harvey Jackson, the informer, who did not testify at trial, met defendant White in the kitchen of the informer's Chicago home. The informer had concealed on his person a kel set transmitter and had allowed a narcotics agent, Carl Jackson, to hide himself in a closet adjacent to the kitchen. While agent Jackson was so concealed, he overheard a conversation between informer Jackson and White and observed White transfer a package to the informer. This package, according to subsequent tests, contained heroin. From inside the closet where he could see White and the informer through the slightly open doors, agent Jackson overheard the informer inquire how many ounces there were in the package; the defendant responded, "one good ounce." After asserting that he would return the following day for payment, the defendant left the informer's home. Narcotics agent Robert DeFauw who was situated in an automobile outside the informer's home overheard the entire conversation on a radio which received transmissions from the informer's kel set.

On December 10, 1965 the informer called White from a public telephone and arranged an appointment for that day at the informer's home so that payment for a prior narcotics transfer could be made. Agent Jackson, with the informer's permission, overheard this conversation on the same telephone receiver used by the informer. Agent Jackson and the informer then went to the latter's home, where agent Jackson again concealed himself in the closet and observed the informer and White count $1,000 in official funds, previously given the informer by agent DeFauw. White put the money in his pocket, told the informer that he would get more "stuff" on De-

1. Although Judge SCHNACKENBERG participated in the en banc re hearing, he died prior to the adoption of his opinion. As author of the prior panel decision of this court, he was of the view that the rationale of Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576

(1967) required reversal of White's conviction.

2. A radio kel set is a small transistorized device which transmits voices or sound which can be picked up on receiving units.

cember 14, and requested the informer to meet him at 6 p. m. the next day on a specified Chicago street corner for further payment. Again agent DeFauw overheard the entire conversation in his car outside the informer's home by receiving radio transmissions from the kel set which had been previously concealed on the informer's person.

On December 14, 1965 agent DeFauw placed a kel set on the informer's body, furnished him with $360, and followed him to the defendant's residence. A conversation between the defendant and the informer which took place inside the defendant's home was overheard on a radio receiver by agent DeFauw at his position outside White's home. During the course of this monitored conversation, money was counted and arrangements were made for the defendant to sell an additional two ounces of "stuff" on December 16 for $1,250, with payment due within a week and a half after delivery. The defendant requested faster payment since his suppliers wanted their money sooner and arrangements were made to meet again at 6 p. m. on December 16.

On December 16, 1965 agent DeFauw placed a kel set under the informer's clothing and followed him to a Chicago intersection where the informer met White who entered the informer's car. While White and the informer drove around the city for two hours, agent DeFauw, following them in his car, overheard by radio receiver their conversation concerning the price and quality of heroin. Thereafter the informer left the car because White said he had to meet "this man." White drove the car a few blocks to another Chicago intersection where he picked up Sam Minerva, a supplier of narcotics. At this point agent William Kerstann who was trailing White, observed Minerva emerge from the car after riding a short distance. Kerstann followed White a couple of blocks to a street corner where the informer re-entered the car. By radio receiver, Kerstann overheard the defendant say that he had met a certain man and

received a package which he would leave on the seat of the informer's car. Then White said he had to leave the informer in order to meet another man. After White's departure, agent Kerstann entered the car and seized the package containing heroin.

On December 28, 1965 the informer was given $1,250 and a kel set was placed under his clothes. While followed by agent DeFauw, agent Jackson and the informer drove to the latter's residence, where agent Jackson resumed his usual surveillance position in the kitchen closet. Jackson saw the defendant enter the kitchen, sit down at a table, and join the informer in counting the $1,250. When the informer requested more heroin, White advised him that more would be forthcoming the following day, but that payment would have to be made more quickly because the supplier "wanted his money." Agent Jackson overheard the conversation from the closet and agent DeFauw listened on a radio receiver from his position in a car outside the informer's residence.

On the following day, agents David Connolly and Arthur Lewis followed White from his residence to a tavern where he talked briefly to Harry D. Williams, another narcotics peddler, and then departed. After stopping at a clothing store, White drove to a Chicago intersection where he picked up Minerva who accompanied White for one-half block. Although Minerva was carrying a white shoe box when he entered White's car, he left with a black briefcase. White drove a block, picked up Williams, and returned to the tavern where they had talked earlier the same day. Meanwhile the informer, equipped with a kel set, had entered the same tavern. While Williams remained in the car, White went into the tavern and talked with the informer. They left and drove a few blocks in separate cars to a point where the defendant stopped, got out of his car, walked to the informer's car, and handed him a sack. Agent Vernon Meyer, who had been surveilling the informer's activities, heard over a radio in

his car the defendant ask the informer to take Williams to the city's south side. Williams, also carrying a brown paper sack, entered the informer's car and drove with him to their appointed destination. After discharging Williams, the informer met agent DeFauw and gave him the paper sack which contained heroin.

On January 5, 1966 agent DeFauw placed a kel set on the informer and gave him $1,300. From the closet in the informer's kitchen where he was secreted, agent Jackson observed the defendant and the informer count the money. The defendant told the informer to bring the "remaining $950" to the Dining Room Aluminer, a restaurant operated by White. White also requested that the informer purchase a large amount of heroin and pay in advance. The entire conversation was heard by agent DeFauw over the radio in his car.

Two days later, the informer was given $950 and had a kel set placed on his person by agent DeFauw. The agent followed the informer to White's Dining Room Aluminer which the informant entered. From his automobile, agent DeFauw heard over his radio the defendant tell the informer that the price of heroin was going up and that he should meet White at a Chicago intersection where a $2,500 heroin delivery would be made.

On January 8, 1966 agent DeFauw saw Minerva standing at a city bus stop. The defendant drove up, stopped, opened the door, and Minerva approached the car. White said, "Come on, man, give me the package, I've got to get out of here." Minerva handed a brown leather briefcase into the car and said that he would pick up the money later. Agent DeFauw placed the defendant White under arrest and seized the briefcase containing heroin.

■ The Government's evidence was based largely upon oral testimony by the narcotics agents that they overheard incriminating statements made by White to the secret informer, Harvey Jackson, and transmitted by the kel set device. As we have heretofore stated, these transmitted conversations occurred in the defendant's home, automobile, and place of business as well as in the informer's automobile and home.[3] The defense objected when agent DeFauw and other agents testified concerning White's incriminating statements transmitted from the kel set concealed on the informer's body. The objection was overruled. A motion by the defense made at the conclusion of the Government's case to strike the conversations to which the various agents testified on the ground that they were in violation of the fourth and fifth amendments was denied by the court.

The central issue presented is whether defendant White's fourth amendment rights, protecting him against governmental intrusion by unreasonable search and seizure, were infringed when the Government narcotics agents electronically intercepted his private conversations.

To decide the constitutionality of the Government's surreptitious overhearing of White's conversations, we apply the criteria recently set forth in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The facts of Katz were that Federal Bureau of Investigation agents, having probable cause and acting in a carefully controlled manner but without prior judicial approval, placed an electronic listening and recording device outside a public telephone booth and intercepted telephone conver-

---

3. There can be no doubt that these may be constitutionally protected areas. "Wherever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures." United States v. Katz, 389 U.S. at 359, 88 S.Ct. at 515. See also, United States v. Hagarty, 388 F.2d 713 (7th Cir. 1968); Lanza v. New York, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962) (jail visiting room not a protected area). It is not the area alone, but the relationship between the area and the person protected that is critical.

sations which the defendant made from the booth to others without the knowledge or consent of the defendant or any of the other parties to the conversations. In reversing the defendant's conviction, the Supreme Court held that the admission of these conversations as evidence, covertly obtained by electronic surveillance, was improper because they were seized in violation of the defendant's fourth amendment rights. Essentially, the Supreme Court's determination was grounded on the lack of prior judicial authorization, because no search warrant had been obtained, and the fact that under the circumstances antecedent justification before a magistrate was essential to insure the defendant's fourth amendment guarantees.

■ The *Katz* opinion stated that the fourth amendment is designed to preserve privacy against the "uninvited ear" of governmental intrusion and must be applied to "protect people, not places." [4] The trespass doctrine, suggested earlier in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), and Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), and which provided the basis for prior Supreme Court decisions in this area, such as On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952), was squarely discarded by the Court in *Katz:* "[T]he underpinnings of *Olmstead* and *Goldman* have been so eroded by our subsequent decisions that the 'trespass' doctrine there enunciated can no longer be regarded as controlling." 389 U.S. at 353, 88 S.Ct. at 512.

■ The *Katz* case further indicates that conversations are within the scope of the fourth amendment's protection: "[T]he Fourth Amendment governs not only the seizure of tangible items, but extends as well to the record-

ing of oral statements, overheard without any 'technical trespass under * * local property law.' Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734." 389 U.S. at 353, 88 S.Ct. at 512. Consequently, White's covertly overheard statements are within the scope of the fourth amendment's guarantees.

The Government urges us to disregard the *Katz* rationale because of certain factual differences. Although we recognize these factual differences, we believe them to be without legal significance. It is true that the *Katz* case involved governmental interception of a conversation without the consent or knowledge of either party, whereas in the present case one party to the monitored conversation, informer Jackson, was cognizant of the Government's eavesdropping activities.

It is our opinion, however, that the surreptitious placing of the kel set on informer Jackson was for all conceptual purposes the same as the surreptitious wiring of the telephone booth in *Katz*. Each act was part of a "bugging" technique by which a conversation was transmitted to an "uninvited ear"—government agents. The crucial fact in each case is that the respective speakers did not consent to the overhearing of their statements and that the conversations were overheard by third persons uninvited by the speaker.

To claim, as the Government does, that one party can waive the fourth amendment rights of another is the same thing as saying that *Katz* would have been decided differently if the recipient of the intercepted phone call had consented to the Government's bugging. We are unable to believe that such a meaningless form of consent would have rendered the defendant's overheard statements any more admissible in *Katz*. Since we think

4. The relationship between eavesdropping and the right to privacy has been the source of continuing judicial concern. Wiretapping and other forms of eavesdropping are recognized by even their most zealous advocates as encroachments on a man's right to privacy, characterized by

Justice Brandeis as "the most comprehensive of rights and the right most valued by civilized men." Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (dissenting opinion).

no distinction of constitutional significance can be drawn between the third party overhearing presented in *Katz* and the consensual monitoring here, the fact of listener consent is without decisional significance and cannot operate as a waiver of any speaker's fourth amendment rights.[5]

▮ The content of the defendant's private conversations, intercepted by the Government's clandestine activity and without prior judicial control, must be held as per se inadmissible evidence if the language of *Katz* is literally applied:

> Searches conducted without warrants have been held unlawful "notwithstanding facts questionably showing probable cause," Agnello v. United States, 269 U.S. 20, 33, [46 S.Ct. 4, 6, 70 L.Ed. 145] for the Constitution requires "that the deliberate, impartial judgment of a judicial officer * * * be interposed between the citizen and the police * * *." Wong Sun v. United States, 371 U.S. 471, 481–482 [83 S.Ct. 407, 414, 9 L.Ed.2d 441]. "Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes," United States v. Jeffers, 342 U.S. 48, 51 [72 S.Ct. 93, 95, 96 L.Ed. 59], and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—sub-

ject only to a few specifically established and well-delineated exceptions.[6] Katz v. United States, 389 U.S. at 357, 88 S.Ct. at 514 [footnotes omitted].

It is especially important that the Court in Katz referred with approval to Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), where the essentiality of prior authorization was emphasized. In *Osborn* a paid informer recorded conversations between himself and the defendant in order to corroborate his sworn statement that the defendant was attempting to employ him to bribe a prospective juror. *Osborn* teaches what the agents in the instant case should have done, but failed to do, namely, obtain a warrant authorizing the use of electronic surveillance devices.

The exceptions to the warrant rule of *Osborn* and *Katz* which are explicitly mentioned in the *Katz* opinion do not have application to the governmental eavesdropping endeavors presented by the present case. In fact, our conclusion that the agents' testimony relating to the transmitted statements of the defendant which they overheard is inadmissible is strengthened by the Supreme Court's unequivocal language which clearly precludes the existence of any fourth amendment exception for consensual surveillance. "And, of course, the very nature of electronic surveillance *precludes* its use pursuant to the suspect's consent." Katz v. United States, 389 U.S. at 358,

---

5. In holding that the rationale of *Katz* applies regardless of whether one party to a private conversation consents to the Government's interception of the conversation, we do not purport to make any determination regarding the voluntariness of informer Jackson's participation in the agents' scheme. Since it is our view that a listener's consent is irrelevant, it is difficult to see how informer Jackson's conduct, whether the product of coercion or consent, could have constituted a waiver of the defendant's constitutional rights. Only his own consent could have created such a waiver. The rationale of *Katz* permits no other conclusion.

6. These exceptions permit a warrantless search whenever the burden of obtaining a warrant would be likely to frustrate the

purpose of the search. See, e. g., Camara v. Municipal Court, 387 U.S. 523, 533, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Thus, the Court has allowed a warrantless search of an automobile on the ground that it might leave the jurisdiction before a warrant could be obtained, Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and has approved taking a blood sample without first securing a warrant as necessary to prevent dissipation of the blood's alcoholic content, Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed. 908 (1966). In the present case, the Government did not argue that the evidence would have been lost due to the delay of obtaining a warrant, nor do the facts suggest that such an argument could have been made.

88 S.Ct. at 515 (emphasis added). Thus the literal language of *Katz* as applied to the case before us would require reversal since White did not consent to the eavesdropping and no antecedent justification was sought.

Our view as to the result which must be reached upon the application of the *Katz* principles is reinforced by our understanding of the fourth amendment. That amendment's search and seizure protection is lost to a person when his actions as a matter of law can be said to constitute a waiver of his right. Since the fourth amendment protects a speaker's right to privacy, this right would be illusory if it could be waived by other individuals.

 The decisions provide a catalogue of instances where a speaker's behavior is such that a waiver of his fourth amendment rights has occurred as a matter of law. For example, Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed. 374 (1966), is based on the unarticulated rationale that when one speaks he takes the risk that his intended listener may subsequently testify as to the contents of the conversation. Such a risk, although perhaps the product of a "misplaced confidence," is reasonably foreseeable, and thus objection thereto is waived. Another risk taken by a speaker is outlined in Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957).[7] In that case, the

Court determined that on a constructive knowledge theory it is not unreasonable to say that one who places a telephone call takes the risk that an extension on the other end of the line may be picked up by an uninvited third party with or without the complicity of the intended listener.[8] The focal point in determining the existence of a speaker's fourth amendment rights must be whether his activity was directed at keeping his statements private and what were the risks of overhearing which he should have justifiably anticipated at the time of his statements.[9] In deciding whether the defendant waived his fourth amendment rights, we are mindful of the Supreme Court's admonition in Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938): " '[C]ourts [should] indulge every reasonable presumption against waiver' of fundamental constitutional rights and * * * we 'do not presume acquiescence in the loss of fundamental rights.' "

Nonetheless, the Government, relying upon the following statement from *Katz*, attempts to distinguish that opinion from the facts before us, "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." United States v. Katz, 389 U.S. at 351, 88 S.Ct. at 511. To ascertain the applicability of that formulation, we must address ourselves to the questions of

7. To the extent that *Rathbun* is based on the one party consent theory, it is inconsistent with the broad ruling of *Katz*. We view it from the speaker risk point of view for purposes of our present discussion.

8. It is important for courts deciding fourth amendment questions to take into account the relationship between that amendment and the first amendment's penumbral protection of privacy. It is this nexus which makes a speaker risk analysis appropriate. If the law places great risks of governmental intrusion on an individual's activity, especially his private speech, he will be inhibited in the free exercise of his first amendment rights, that is, the broader the scope of governmental searches and seizures which are determined to be consistent with the fourth amendment, the

narrower the ambit of protected first amendment activity will become. This important interrelationship is detailed in Greenawalt, The Consent Problem in Wiretapping & Eavesdropping: Surreptitious Monitoring with the Consent of a Participant in a Conversation, 68 Colum.L.Rev. 189 (1968).

9. This court, speaking through Judge Hastings, recently recognized a substantially similar inquiry: "One who intends a conversation or transaction to be private and takes reasonable steps to keep it private is protected from government intrusion unauthorized by warrant or well-defined special circumstances." United States v. Haden, 397 F.2d 460, 465 (7th Cir. 1968).

whether the Government's activities violated a justifiable expectation of privacy which the defendant held and whether he acted in such a manner as to knowingly expose his statements and thus waive his rights.[10] A realistic appraisal of the defendant's conduct permits no other conclusion than that he justifiably expected his conversations to be private.[11] The well-laid plans of the Government agents were made because they recognized that the defendant sought to exclude their uninvited ears. Why else would they have hired informer Jackson, placed upon his person a hidden radio transmitter, and concealed agent Jackson in the informer's kitchen closet to overhear the defendant's conversation? Additionally, the locations chosen for the private conversations indicate that the defendant took reasonable steps to protect against governmental intrusion. In such a situation we can only conclude that the defendant's fourth amendment rights were violated,[12] that the failure to suppress the evidence of his statement was

error, and that their admission at trial constituted ground for reversal.[13]

Although the Government has cited numerous cases to support its position, they are inapposite. Unlike the case before us, Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), and Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), presented situations where there was no electronic interception or transmission of the defendants' statements. They stand for the proposition that an informer is a competent witness as to conversations and dealings with a defendant. Looked at from the viewpoint of the speaker, these cases demonstrate that a person confiding in another takes the risk that the confidence may be misplaced and that the confidant may memorize or record the statements and repeat them at trial. That risk and the applicable rule provide no guidance for the present problem.

Likewise, Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134

---

10. Other tests have been suggested to determine the precise contours of the fourth amendment's protection. As articulated in his concurring opinion in *Katz*, Justice Harlan sets up a twofold requirement: "[f]irst that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" 389 U.S. at 361, 88 S.Ct. at 517 (concurring opinion).

11. The justifiable expectation of privacy is a conclusion which must be drawn only after an examination of all the circumstances surrounding the context in which the asserted right arises; one of these circumstances is the place which the individual has attempted to appropriate to his personal use in asserting his claim to privacy. This was illustrated in another search and seizure case decided after *Katz*, Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). In deciding that a union official has standing to object to seizure of union records from an office he shares with other officials, the Court phrased the relevant question as whether the defendant while occupying such a place could justifiably expect freedom from governmental intrusion.

12. According to the language in *Katz*, "[T]he Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied * * * and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." Id. 389 U.S. at 353, 88 S.Ct. at 512. The assessment made by the Court regarding *Katz* is equally applicable to the defendant White: "[He] surely is entitled to assume that the words he utters * * * will not be broadcast to the world." Id. at 352, 88 S.Ct. at 512.

13. Other courts have reached an identical conclusion in light of the *Katz* decision. E. g., Doty v. United States, 3 Crim.L.R. 2220 (10th Cir. 1968), decision on rehearing pending; United States v. Jones, 292 F.Supp. 1001 (D.D.C.1968). Contra, Dancy v. United States, 390 F.2d 370 (5th Cir. 1968) (Fahy, J., sitting by designation from the D.C. Cir., dissenting). Other circuits which have faced the issue here presented such as the Second Circuit in United States v. Jackson, 390 F.2d 317 (2d Cir. 1968), and the Ninth Circuit in Jack v. United States, 387 F.2d 471 (9th Cir. 1967), voiced their opinion before the Supreme Court's adjudication of *Katz*.

(1957), a consensual overhearing case not decided on a constitutional basis, involved the assumption of a risk by the defendant that operated as a waiver of his fourth amendment protection. The holdings of *Rathbun* and this court's decision in Williams v. United States, 311 F.2d 721 (7th Cir.), cert. denied, 374 U.S. 812, 83 S.Ct. 1703, 10 L.Ed.2d 1035 (1963), do not settle the question before us and are of no benefit to the Government.

Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), has factual features which distinguish it from the instant case. In *Lopez* a concealed device on the person of an undercover agent recorded a conversation between him and the defendant. Admission in evidence of the recording itself to corroborate the undercover agent's testimony was upheld in the circumstances of the case. The important distinction between *Lopez* and this case is that here the informer, Harvey Jackson, was not produced as a witness whereas in *Lopez* the Government agent was a witness. *Lopez* goes no further than to hold that where an informer testifies as to conversations with a defendant, a recording of such conversations is admissible for the limited purpose of corroboration.

In Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), a Government informer recorded conversations between himself and the defendant for the purpose of corroborating his allegations that the defendant was endeavoring to employ him to bribe a prospective juror. Although the case involved monitoring with the consent of the informer, there was proper judicial approval of the reasonableness of the recording.

The Government's principal reliance is placed on the decision in On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). There an electronic device which transmitted two conversations between an agent and the defendant, one of which took place in the defendant's laundry and the other a few days later on the street, was concealed on the body of an undercover agent. On each occasion the transmitted conversation was heard by a government agent stationed nearby with a receiving device. The agent's testimony as to what he had heard was held admissible over the defendant's contention that the informer was a trespasser and that hence the seizure was proscribed by the fourth amendment. On its facts, *On Lee* is directly in point and would control the disposition of this case if *Katz* had not supervened and if the Supreme Court had not on other occasions completely eroded the decisional basis of *On Lee*.

The recent treatment of the *On Lee* doctrine indicates that it now stands on unfirm ground. Not only did four members of the Supreme Court disagree with *On Lee* when it was decided, but also in *Lopez*, the majority pointed out that *On Lee* was of no help to the defendant. The Chief Justice, in his concurring opinion, was careful to make plain that he could not join in any implication that the majority was accepting the continued vitality of *On Lee*.[14]

The most lethal blow to *On Lee* was dealt by the Court's overruling in *Katz*

14. Chief Justice Warren said: "Since I agree with Mr. Justice Brennan that *On Lee* was wrongly decided and should not be revitalized, but base my views on grounds different from those stated in the dissent, I have chosen to concur specially." United States v. Lopez, 373 U.S. at 441, 83 S.Ct. at 1389.

Justice Brennan, joined by Justices Douglas and Goldberg, stated in dissent: "The Court's refusal to accord more than passing mention in its opinion to the only decision of this Court—*On Lee*—factually analogous to the case at bar suggests very strongly that some of my colleagues who have joined the Court's opinion today agree with us that *On Lee* should be considered a dead letter. For the Court, rather than follow *On Lee*, has adopted the substance of the Government's attempted distinction between *On Lee* and the instant case." Id. at 447, 83 S.Ct. at 1392.

of the *Goldman* and *Olmstead* bulwark which had provided the conceptual basis for *On Lee*.[15] The overruling of these cases combined with the reasoning of *Katz* leaves no scope for *On Lee's* teaching. For these reasons, *On Lee* cannot be the foundation of our decision.

■ On the basis of the constitutional principles set forth in *Katz* and our understanding of the protection which the fourth amendment was drawn to provide, we are of the opinion that the surreptitious monitoring of the defendant's conversations was a naked violation of his rights and that the resultant seizure of his statements was not made in conformity with the provisions of that amendment.[16]

In view of our disposition of this issue we find it unnecessary to consider the other alleged errors presented by the defendant.

Accordingly, we adhere to our previous decision reversing the judgment of the district court and remand the case for a new trial.

CASTLE, Chief Judge, with whom HASTINGS and FAIRCHILD, Circuit Judges, join, dissenting.

I find myself unable to agree that the decisional basis of *On Lee* has been eroded to the extent that the electronic monitoring of the defendant's conversations with the informer, with the latter's consent, must now be regarded as constituting an unreasonable search and seizure in violation of the Fourth Amendment. The majority opinion recognizes that on its facts *On Lee* is directly in point and would control the disposition of this case unless its teaching is to be completely rejected. I join with Justice White in regarding *On Lee* as "undisturbed" by the decision in *Katz*. (Concurring opinion, Katz v. United States, 389 U.S. 347, 363, n., 88 S.Ct. 507, 19 L. Ed.2d 576 (1967)).

Although a substantial part of the rationale of *On Lee* has arguably been discredited in later cases,[1] the case was cited with approval in Lopez v. United States, 373 U.S. 427, 438, 83 S.Ct. 1381, 10 L. Ed.2d 462 (1963) and in Katz v. United States, 389 U.S. 347, 363, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Concurring opinion of Justice White).

The Government's use of conversations obtained by the deception of a Government agent has been dealt with in numerous cases, and the validity of such conduct has consistently been upheld where the conversation was freely entered into by the defendant.

Thus, in Lopez v. United States, 373 U.S. 427, 439, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), the Supreme Court held that the recording made by a Government agent of a bribe offer was properly admitted into evidence. Since the agent was entitled to, and did, testify about the conversation he had with the defendant, there was no "seizure" of anything without the defendant's knowledge and consent when he voluntarily participated in the incriminating conversation. The recording device, therefore, was used only to obtain the most reliable evidence possible of a conversation which the Government rightfully heard through its

15. For further discussion see p. 843 supra.

16. The present decision overrules our prior determinations pertaining to the admissibility of statements seized in situations similar to those presented here. E. g., United States v. Pullings, 321 F.2d 287, 295 (7th Cir. 1963), and United States v. Vittoria, 284 F.2d 451, 455 (7th Cir. 1960), wherein we held that by consent an individual can waive another party's fourth amendment rights.

1. e. g., Warden Md. Penitentiary v. Hayden, 387 U.S. 294, 304, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967): "The premise that property interests control the right of the Government to search and seize has been discredited." Cf. Katz v. United States, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967); Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

agent. Moreover, the case involved "no 'eavesdropping' whatever in any proper sense of that term. The Government did not use an electronic device to listen in on conversations it could not otherwise have heard." 373 U.S. at 439, 83 S.Ct. at 1388. It followed that there was no search and seizure which violated the Fourth Amendment.

Even more recently decided were Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), and Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). In *Lewis*, the Court held that where the defendant invited a person, who was a secret Government agent, into his house for the purpose of selling narcotics to the agent, the subsequent admission into evidence of the narcotics bought by the agent and the conversations which had taken place between the parties did not violate the Fourth Amendment since the agent took nothing which the defendant had not voluntarily given to him, and the deception did not nullify the defendant's consent.

In *Hoffa*, the Court held that no violation of the Fourth Amendment occurred when an acquaintance of defendant, whom defendant had invited to his hotel suite, heard conversations directed to him or to others in his presence. Unknown to defendant the acquaintance was a paid Government informer. Holding that this was merely a case of "misplaced confidence" rather than unreasonable search and seizure, the Court noted that "[n]either this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." (Citing Lopez). 385 U.S. at 302, 87 S.Ct. at 413.

Taken together, these cases establish the principle that one who voluntarily enters into a conversation with another takes the risk that such person may memorize, record, or (including *On Lee*) transmit the conversation.[2] It seems reasonable to conclude that if the recording in *Lopez* was not "eavesdropping," because it was done with the consent of one of the participants, and therefore not an unreasonable search and seizure, then a transmission is likewise not prohibited by the Fourth Amendment. Absent statutory prohibition, there is no legal significance in the fact that in one case, the transmission, a person is simultaneously overhearing the conversation with the consent of one of the participants while in the other a machine is employed to record such conversation for future disclosure. Therefore, I perceive no distinction which would require different treatment for purposes of the Fourth Amendment.

I do not read the recent decision in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) as changing the law as expressed in the cases just discussed. Nor do I view the decision in *Katz* as extending to the degree ascribed to it by the majority. In *Katz*, the Court reversed a conviction based upon one side of a telephone conversation overheard by Government agents by means of an electronic eavesdropping device installed on the public telephone booth in which defendant placed his call. The Court held that:

> " * * * the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not subject to Fourth Amendment protection. See Lewis v. United States, 385 U.S. 206, 210 [87 S.Ct. 424, 427, 17 L. Ed.2d 312]; United States v. Lee, 274 U.S. 559, 563 [47 S.Ct. 746, 748, 71 L. Ed. 1202]. But what he seeks to preserve as private, even in an area accessable to the public, may be constitutionally protected. * * * " 389 U.S. at 351–352, 88 S.Ct. at 511.

·The use of this language by the Supreme Court illustrates the distinction

---

**2.** It is important to note that, as in the instant case, there was no search warrant or court order in *Lopez, Lewis,* or *Hoffa.*

between *Katz* and the instant case, and demonstrates the present state of the law. In *Katz,* the Government surreptitiously overheard one side of a conversation without the consent of either party thereto, and after the defendant had taken reasonable steps to protect his privacy. The Court, therefore, held that "[t]he Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." 389 U.S. at 353, 88 S.Ct. at 212.

Unlike *Katz,* the instant case involves not a search and seizure, but a misplaced confidence—not surreptitious eavesdropping, but merely the obtaining of evidence of a conversation in which the Government, through its informer, was a participant. See Lopez v. United States, 373 U.S. 427, 439, 83 S.Ct. 1381, 10 L.Ed. 2d 462 (1963). Had the person on the other end of the telephone line in *Katz* allowed a Government agent to listen in on the conversation, there would have been no constitutional violation. Rathbun v. United States, 355 U.S. 107, 111, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); United States v. Williams, 311 F.2d 721, 725 (7th Cir. 1963), cert. den. 374 U.S. 812, 83 S.Ct. 1703, 10 L.Ed.2d 1035 (1963). Thus, once the conversation is deprived of its private character through the consent of one of the parties thereto, the Fourth Amendment, not having prohibited the initial exposure, does not prohibit the introduction into evidence of the conversation as transmitted or recorded. As stated in *Katz,* itself, "what a person knowingly exposes to the public, *even in his own home or office,* is not subject to Fourth Amendment protection. See Lewis v. United States, 385 U.S. 206, 210 [87 S.Ct. 424, 427, 17 L.Ed.2d 312] * * *." 389 U.S. at 351, 88 S.Ct. at 511 (emphasis added).

Thus, any expectation, by defendant, of privacy, when the person to whom the defendant is speaking consents to exposure of the conversation is not reasonable and therefore not protected by the Fourth Amendment. This Court recently pointed out the distinction between electronic eavesdropping and misplaced confidence in United States v. Haden, 397 F.2d 460 (7th Cir. 1968), where we held (at page 465):

"One who intends a conversation or transaction to be private and takes reasonable steps to keep it private is protected from government intrusion unauthorized by warrant or well-defined special circumstances. Cf. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). But he is not protected from the consequences of error if he places trust in the silence, duplicity or complicity of a government agent or informer."

Therefore, the application of *Katz* to the instant case is its recognition of the principle that:

"When one man speaks to another he takes all the risks ordinarily inherent in so doing, including the risk that the man to whom he speaks will make public what he has heard. The Fourth Amendment does not protect against unreliable (or law-abiding) associates. Hoffa v. United States, supra. It is but a logical and reasonable extension of this principle that a man take the risk that his hearer, free to memorize what he hears for later verbatim repetitions, is instead recording it or transmitting it to another. The present case [*Katz*] deals with an entirely different situation, for as the Court emphasizes, the petitioner "sought to exclude * * * the uninvited ear," and spoke under circumstances in which a reasonable person would assume that uninvited ears were not listening." Katz v. United States, 389 U.S. 347, 363 n., 88 S.Ct. 507, 517, 19 L.Ed.2d 576 (1967) (Concurring opin-

ion of Justice White), (Emphasis supplied).[3]

In concluding that the Fourth Amendment does not prohibit the transmission of a conversation to a Government agent by a participant therein, where the defendant is a voluntary party to the conversation, I am mindful of the fact that, as recognized in numerous Supreme Court decisions,[4] as well as our own,[5] the stratagem of deception is often the only way the Government can obtain information relating to a crime. To prohibit the use of such deceit might, in certain areas, prevent effective law enforcement. The Supreme Court in Lewis v. United States, 385 U.S. 206, at 210-211, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), cited with approval a quotation from the Model Penal Code § 2.10, comment, p. 16 (Tent.Draft No. 9, 1959):

> "Particularly, in the enforcement of vice, liquor or narcotics laws, it is all but impossible to obtain evidence for prosecution save by the use of decoys. There are rarely complaining witnesses. The participants in the crime enjoy themselves. Misrepresentation by a police officer or agent concerning the identity of the purchaser of illegal narcotics is a practical necessity * * Therefore, the law must attempt to distinguish between those deceits and persuasions which are permissible and those which are not."

For the reasons stated above, I am of the view that the method of deception employed in the instant case is constitutionally permissible and is not so fundamentally unfair as to require reversal in the exercise of our supervisory power over the district court. Rather than being of an indiscriminate nature, as in Berger v. New York, 388 U.S. 41, 87 S.Ct.

1873, 18 L.Ed.2d 1040 (1967), Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), the electronic transmission in the instant case included only those words which defendant voluntarily spoke to the informer and intended that he hear, thus knowingly taking the risk that the informer would disclose them to the Government.

Such view does not, therefore, approve or permit violation of the "requirements of the Fourth Amendment in the name of law enforcement." as Berger forbids (388 U.S. at 62, 87 S.Ct. at 1885), but rests on a conclusion compelled by an analysis of those decisions in which the Supreme Court has to date considered the subject matter.

HASTINGS, Circuit Judge (dissenting).

I join Chief Judge CASTLE in his able dissent in this case. I wish to add a few brief comments of my own.

I was moved to vote for a rehearing en banc in the instant White case because I thought the majority opinion, written by the late Judge Schnackenberg, mistakenly relied upon Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), as its authority for a reversal of the judgment of conviction. I thought at that time, as I do now, that the factual situation in Katz is so unlike the present case before us as to furnish no controlling precedent.

The original panel opinion was handed down in slip opinion form on March 18, 1968. Judge Major and Schnackenberg were in the majority, with Chief Judge Castle in dissent. It is conceded in the present en banc majority opinion that

---

3. Justice White, in the same footnote, also cited Hoffa, Lopez and On Lee as cases "which are undisturbed by today's decision."

4. e. g., Lewis v. United States, 385 U.S. 206, 208-211, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); Sorrells v. United States, 287 U.S. 435, 441-442, 53 S.Ct. 210, 77

L.Ed. 413 (1932); Andrews v. United States, 162 U.S. 420, 423, 16 S.Ct. 798, 40 L.Ed. 1023 (1896).

5. e. g., United State v. Haden, 397 F.2d 460 (7th Cir. 1968); United States v. Lauchli, 371 F.2d 303 (7th Cir. 1966); See also Cellino v. United States, 276 F.2d 941 (9th Cir. 1960).

the author of the prior panel majority decision was of the view that the rationale of *Katz* required a reversal of White's conviction. Yet that is precisely the same position taken by Judge SWYGERT in the instant majority opinion. Why was it necessary to indulge in this exercise in semantics to reach the same result on the same cited authority?

I concede that Judge SWYGERT'S majority opinion is a sophisticated constitutional essay in contrast to the short direct approach taken by Judge Schnackenberg. But therein may lie a present danger. With deference, I suggest that the present majority has undertaken a broad construction of *Katz* that was not taken by the Supreme Court. For a stimulating treatment of the subject I recommend the reading of Katz v. United States: The Limits of The Fourth Amendment, by Edmund W. Kitch, Associate Professor of Law, The University of Chicago.[1]

My final comment is directed to the rather summary reversal of On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952), by the majority here. Chief Judge CASTLE has ably covered this in his dissent. My fundamental objection to the majority mistreatment of *On Lee* is that it has no authority to do what it did. I have long held the rather old fashioned view that only the Supreme Court could set aside its holdings. By the process of taking a head count and making a guess on what the Court may do at some future time, the majority holds: "On its facts, *On Lee* is directly in point and would control the disposition of this case if *Katz* had not supervened and if the Supreme Court had not on other occasions completely eroded the decisional basis of *On Lee*."

I make no prophecy on the future of *On Lee*. Until it is set aside by the Supreme Court, I regard it as controlling and dispositive of the present appeal. I would affirm the judgment of conviction.

1. Released a few days ago by The University of Chicago Press, as a chapter in The Supreme Court Review, 1968, pp.

133–152, edited by Professor Philip B. Kurland.