**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Daniel ESCOBEDO, a/k/a Danny Escobedo, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Daniel AGUIRRE, Defendant-Appellant.**

**Nos. 16916–16918.**

United States Court of Appeals, Seventh Circuit.

June 30, 1970.

Rehearing Denied in No. 16917 Aug. 18, 1970.

Rehearing En Banc Denied in Nos. 16916 and 16918 Aug. 25, 1970.

Thomas J. Farrell, Sidney S. Altman, Chicago, Ill., for defendant-appellant.

Thomas A. Foran, U. S. Atty., John B. Simon, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Michael B. Nash, Asst. U. S. Attys., of counsel.

Before CASTLE, Senior Circuit Judge, CUMMINGS and KERNER, Circuit Judges.

CUMMINGS, Circuit Judge.

This appeal is from convictions of narcotic offenses under two indictments consolidated for trial. One indictment was in two counts and first charged defendant Daniel Escobedo with selling 11 grams of heroin to Robert B. Victoria on August 3, 1967, in Chicago without the necessary written order blank, in violation of 26 U.S.C. § 4705(a). The second count charged Escobedo with receiving the heroin on the same date, knowing that it had been illegally imported, in violation of 21 U.S.C. § 174.

The other indictment was in six counts and charged Escobedo and Daniel Aguirre with like offenses occurring in Chicago on June 6 and 13, and July 27, 1967. The defendants were found guilty on all counts after a jury trial. Escobedo received concurrent sentences of seven years on each of the two counts of the first indictment to run consecutively to fifteen-year concurrent sentences on each of the six counts of the second indictment. Aguirre was also sentenced to fifteen-year concurrent terms on the six counts of the second indictment. We ordered the appeals consolidated.

In May 1967, government informant Santiago Hernandez[1] introduced Escobedo to "Robert Garcia of Gary, Indiana." Garcia was actually Special Agent Robert Victoria of the Federal Bureau of Narcotics.

As to the indictment against Escobedo alone, the evidence showed that at 10 P. M. on July 27, 1967, Victoria asked Escobedo how much an ounce of heroin would cost. Escobedo said he would have to check. Victoria telephoned him on July 31 and was told that he had not yet found out the price but would have the information on August 1. Victoria telephoned Escobedo at home that day and was told that an ounce of heroin would cost $1,755. Escobedo promised

---

1. Aguirre's motion to supplement the record is granted. However, the attachments thereto concerning the April 6, 1967, arrest of Hernandez on a narcotics offense are irrelevant, for his offense occurred the previous day in Hoffman's Estates, Illinois, and does not bear on the later transfers involved in these indictments. We credit the answer to the motion insofar as it reveals that no exhibits of Aguirre are in the Government's possession.

Victoria a good weight of heroin for $1,000, and they agreed to effect the sale on August 3 at Marion's Lounge at 27th and Princeton Streets, in Chicago.

Accordingly, Victoria met Escobedo at Marion's Lounge at 8:30 P.M. on August 3. In the men's lavatory, Escobedo told Victoria he could purchase 12 grams of heroin for $1,000. Victoria consented and paid Escobedo the $1,000. Since Escobedo would not let Victoria accompany him to pick up the heroin, Victoria took Escobedo's wallet as security. Ten minutes later Escobedo left the Lounge and went to the alley behind his residence. He returned at 9 P.M. and signaled Victoria to come outside the Lounge. There he handed Victoria a package containing 11.313 grams of a mixture containing heroin hydrochloride. Victoria returned Escobedo's wallet later that evening. He had not given Escobedo the requisite order blank when he purchased the heroin.

As to the three dual offenses involved in the other indictment concerning both Escobedo and Aguirre, Victoria told Escobedo on May 11, 1967, that he would like to purchase 5 grams of heroin. Escobedo said he would have to check with his source and then brought Aguirre to Marion's Lounge to meet Victoria. Aguirre said his source did not have any heroin available, but that Aguirre and Escobedo were awaiting a shipment.

On June 1, 1967, by pre-arrangement, Victoria met Aguirre outside of Mi Ultimo Refugio Lounge at 26th and Normal Streets in Chicago. Aguirre said the heroin shipment had arrived, and Victoria said he was still interested in purchasing some of it. Aguirre did not know the price per gram and told Victoria to call him about it. On June 6, Victoria did so and was advised that the heroin would cost $50 per gram. He agreed to buy five grams.

At 2:30 P.M. that day, as planned, Victoria met Aguirre at Mi Ultimo Lounge, they entered Victoria's car, and Victoria gave Aguirre $250 for the hero-in. Aguirre then left the car and walked to the alley behind Escobedo's residence, which he entered through a rear gate. Two hours later, Aguirre left Escobedo's residence and met Victoria at Marion's Lounge. Aguirre gave Victoria an aluminum foil package containing 3.087 grams of a mixture containing heroin hydrochloride.

On June 12, Victoria telephoned Aguirre and arranged to meet him at Mi Ultimo Lounge the next day. When they met, Aguirre entered Victoria's automobile and received $500 for heroin at about 12:30 P.M. Two hours later, Aguirre re-entered Victoria's car and gave him 9.333 grams of a mixture containing heroin hydrochloride in two aluminum foil packages. Aguirre stated that he had seen the powder being weighed.

The final transaction set forth in the indictment occurred on July 27. That evening Victoria met Escobedo in Marion's Lounge and said he wanted 10 grams of heroin. After making a telephone call, Escobedo said he could obtain pure heroin for $90 per gram. Victoria then paid Escobedo $450 for 5 grams, and Escobedo agreed to return with the heroin in an hour.

After Escobedo made his telephone call to find out about the heroin, Aguirre left Mi Ultimo Lounge and went into the back yard of Escobedo's residence at 8 P.M. At 9:45 P.M., Escobedo drove into the alley of his residence and left the alley ten minutes later. At 10 P.M. Escobedo returned to Marion's Lounge and told Victoria that delivery would be made shortly. Half an hour later, Escobedo told Victoria he was going to his car to obtain the heroin. Escobedo left the tavern, entered his car, re-entered the tavern, and gave Victoria aluminum foil packages containing 4.140 grams of heroin hydrochloride mixture. On all three occasions covered by the second indictment, Victoria did not give Aguirre or Escobedo the required blank form.

*Kel-set Evidence*

■ Both defendants contend that the trial court erred in admitting evidence obtained by the use of a Kel-set worn by Agent Victoria when conversing with Escobedo and Aguirre. By means of the Kel-set, Agents Raebel and McCurdy overheard and testified to incriminating statements made by the defendants. Defendants assert that their Fourth and Fifth Amendment rights were thus transgressed, and that under our decision in United States v. White, 405 F.2d 838 (7th Cir. 1969), certiorari granted, 394 U.S. 957, 89 S.Ct. 1305, 22 L.Ed.2d 559, evidence derived through the use of that device should have been suppressed. Our decision in *White* rested principally upon our interpretation of the implications of the Supreme Court's opinion in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. In light of the Court's prospective application of that decision (Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248), we have twice denied application of *White* to transmissions predating the December 18, 1967, limit governing application of *Katz*. Roviaro v. United States, 420 F.2d 304 (7th Cir. 1970); United States v. Teller, 412 F.2d 374, 377 (7th Cir. 1969). The last use of the Kel-set in this case occurred on August 3, 1967. No trespass was involved in any of the transmissions in this case, and therefore no violation of defendant's Fourth Amendment rights resulted. On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270. The statements were voluntarily made to the undercover agent and involved no infringement of defendants' privileges against self-incrimination guaranteed by the Fifth Amendment. Cf. Hoffa v. United States, 385 U.S. 293, 303–304, 87 S.Ct. 408, 17 L.Ed.2d 374.

*Recorded Telephone Conversations*

■ Defendants next urge that their constitutional rights were violated by the admission of tape recordings of phone conversations between Escobedo and Victoria in the summer of 1967.[2] Victoria agreed to have these conversations monitored and recorded. Defendants contend that the decisions in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, and United States v. White, 405 F.2d 838 (7th Cir. 1969), certiorari granted, 394 U.S. 957, 89 S.Ct. 1305, 22 L.Ed.2d 559, prohibit introduction of those tapes. It is clear that, prior to the decisions relied upon by defendants, Victoria's consent to the recording legitimated the tapes as evidence for a subsequent trial. See, e. g., United States v. Williams, 311 F.2d 721 (7th Cir. 1963), certiorari denied, 370 U.S. 812, 83 S.Ct. 1703, 10 L.Ed.2d 1035. Even assuming, however, that such were no longer the case in this Circuit,[3] those conversations occurred prior to the December 18, 1967, effective date of the *Katz* and *White* decisions. Nor can we accept defendant's suggestion that these tapes were procured in violation of Illinois state law,[4] and therefore should have been suppressed. It is well settled in this Circuit that federal law governing the admissibility of evidence in federal criminal trials permits the introduction of such tape recordings, even if illegally obtained under state law. United States v. Krol, 374 F.2d 776, 778 (7th

---

2. Aguirre was not a participant in any of the taped conversations at issue. As such he may make no claim for the application of any exclusionary rule based upon the Constitution. Alderman v. United States, 394 U.S. 165, 173–176, 89 S.Ct. 961, 22 L.Ed.2d 176; Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697. In any event, his arguments are subject to the same treatment as defendant Escobedo's and must nevertheless fail, even if standing is indulged.

3. See United States v. White, 405 F.2d 838, at p. 845, note 7, where it is suggested that the "one party consent" approach, upon which Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134, and United States v. Williams, 311 F.2d 721 (7th Cir. 1963), certiorari denied, 370 U.S. 812, 83 S.Ct. 1703, 10 L.Ed.2d 1035, both rest, is no longer sound in light of the broad base of *Katz*.

4. See People v. Kurth, 34 Ill.2d 387, 216 N.E.2d 154 (1966).

Cir. 1967), certiorari denied, 389 U.S. 835, 88 S.Ct. 46, 19 L.Ed.2d 97; United States v. Martin, 372 F.2d 63, 66 (7th Cir. 1967), certiorari denied, 387 U.S. 919, 87 S.Ct. 2033, 18 L.Ed.2d 972.

■ Defendants further contend that the district court erroneously denied their pretrial motions for the production of the tapes of Escobedo's conversations with Victoria. They contend that this production was compelled by the mandate of Rule 16(a) (1) of the Federal Rules of Criminal Procedure. See United States v. Isa, 413 F.2d 244 (7th Cir. 1969). Our review of the motions, however, refutes the claims of either defendant to these items. Escobedo's pretrial motion specifically requested the production of only "[w]ritten or recorded statements or confessions made by the defendant or codefendant to state or federal authorities at any time *on or after his arrest * * *"* (emphasis supplied). Since these tapes were of pre-arrest conversations, Escobedo's motion failed to request their production and there was no error in the Government's negative response to his request. Similarly, Aguirre's motion fell short of stating a valid request for the tapes of Escobedo's telephone conversation under Rule 16(a) (1). His motion demanded only the production of "written or recorded statements or confessions *made by the defendant * * *"* (emphasis supplied). No reference was made to statements of his "codefendant," even assuming such statements would have been obtainable under Rule 16(a) (1) or under 16(b).[5] Nor, in light of the conclusion of this Court in United States v. Sopher, 362 F.2d 523 (7th Cir. 1966), certiorari denied, 385 U.S. 928, 87 S.Ct. 286, 17 L.Ed.2d 210, can we accept the contention that the provisions of the Jencks Act (18 U.S.C. § 3500) required disclosure of the tapes after the direct testimony of Agent Victoria as a gov-

ernment witness. Accordingly, the denial of access to these tapes by the prosecution in this case was not improper.

■ Aguirre alone raises an objection to the manner in which the tape recordings were used in rebuttal of Escobedo's testimony that he had not conversed with Agent Victoria over the phone as Victoria had earlier testified. Subsequent to the use of the tapes, Escobedo again denied the conversations on surrebuttal and stated that the voice on the tapes did not belong to him. We find no merit to Aguirre's objection that the tapes should not have been permitted for impeachment. The fact that they might have been employed to corroborate the initial testimony of Agent Victoria concerning the contents of the testimony does not limit their use to that function. Rebuttal of Escobedo's remarks necessarily included some corroboration of the testimony previously given by Victoria on the identical issue of fact. Aguirre was not prevented from cross-examining all the witnesses involved in that matter for his own purposes, and there was no abuse of the court's discretion because it failed to limit the tapes to their narrowest statements proving the existence of the conversation. Cf. Lindsey v. United States, 332 F.2d 688 (9th Cir. 1964).

## Other Asserted Errors

■ Although Escobedo was the first to raise the point at trial, only Aguirre now contends that the district judge should have excluded Special Agent Raebel from the courtroom. Aguirre urges that Raebel's testimony was influenced through listening to Victoria's testimony. It would, of course, have been better procedure for the Government to have called Raebel at the beginning of the trial, so that he could not hear other witnesses' testimony before

---

5. In light of our conclusion on the inadequacy of Aguirre's pretrial motion, we express no opinion on the discoverability of such tape recordings upon a showing of materiality and relevancy under Rule 16(b).

testifying himself. But the failure to exclude witnesses is not erroneous unless there is a clear abuse of discretion. United States v. Garafolo, 385 F.2d 200, 207 (7th Cir. 1967), reversed on other grounds, 390 U.S. 144, 88 S.Ct. 841, 19 L.Ed.2d 970; United States v. Eley, 314 F.2d 127, 130 (7th Cir. 1963). Here Escobedo's cross-examination of Raebel showed that he was testifying from his own recollection, and Aguirre's counsel did not even attempt to cross-examine him. Therefore, we cannot say that there was a clear abuse of discretion in permitting Raebel to remain at the government counsel's table throughout the trial.

In the indictment against Escobedo alone, the grand jury referred to him as "Daniel Escobedo, also known as Danny Escobedo." He claims that Escobedo's "alias" was used to prejudice the petit jury. His own counsel, however, referred to him as "Danny" in his opening statement. Moreover, the evidence he introduced showed that he was known as Danny and was so called by Aguirre. Accordingly, the inclusion of the alias in this indictment was not prejudicial error.

Aguirre also objects to the Government's supposed failure to disclose the whereabouts of Marcelino Ramirez, Jr., a government informant. A week ahead of the trial, the Government advised defendants that Ramirez' then last known addresses were:

"Box 356, Route 1
Roselle, Illinois and
State of Texas
United States of America"

During the trial, defense counsel learned that Ramirez was living on Morningside Road in Pharr, Texas. Nevertheless, Aguirre did not request the issuance of a subpoena to compel Ramirez' testimony, nor did he seek a continuance while Ramirez was being located. Since Aguirre had sufficient information to subpoena Ramirez, he cannot properly complain that the Government had refused to disclose the name or last known address of an informant. Cf. Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639. Nor was the Government under an obligation to produce him in the circumstances of this case. Aulet v. United States, 425 F.2d 175 (7th Cir. 1970); cf. United States v. Cansler, 419 F.2d 952 (7th Cir. 1969), certiorari denied, 397 U.S. 1029, 90 S.Ct. 1278, 25 L.Ed.2d 540.

Escobedo claims that he was denied due process under the Fifth Amendment because the last of these transfers took place on August 3, 1967, and he was not arrested until September 21, 1967. A review of his trial testimony, however, shows that this short delay did not cause any memory lapses, or any other signs of prejudice to his defense. Cf. United States v. Deloney, 389 F.2d 324 (7th Cir. 1968), certiorari denied, 391 U.S. 904, 88 S.Ct. 1652, 20 L.Ed.2d 417; United States v. Hauff, 395 F.2d 555, 556–557 (7th Cir. 1968), certiorari denied, 393 U.S. 843, 89 S.Ct. 124, 21 L.Ed.2d 113. Moreover, there was a legitimate law enforcement reason for the delay, for narcotics agents were purchasing drugs from Escobedo and Michael Young between August 3, 1967, and September 21, 1967, resulting in another indictment.[6] Although Escobedo also half-heartedly complains of the delay before his January 29, 1968, trial, his own counsel reported that he was not ready for trial on January 3, 1968. Moreover, some of the time between the October 1967 indictments and trial was consumed by his pretrial motions. Accordingly, as in United States v. Lewis, 406 F.2d 486, 494 (7th Cir. 1969), certiorari denied, 394 U.S. 1013, 89 S.Ct. 1630, 23 L.Ed.2d 39, we find no unwar-

6. Escobedo's conviction under that indictment has been appealed and is now under advisement (No. 17112).

ranted delay between the dates of these offenses and the trial.

 We have carefully examined the remaining contentions of defendants and conclude them to be without merit.[7] Therefore, the judgments are affirmed.

---

7. Defendants also claim entrapment, but "[t]he evidence on the defense of entrapment was conflicting and subject to a determination of credibility by the jury." United States v. Aulet, 339 F.2d 934, 936 (7th Cir. 1964). Since the guilty verdict rejecting this defense was supported by substantial evidence, it may not be disturbed.

Although Aguirre contends that the contraband was not heroin hydrochloride, chemist Van Sickle's contrary testimony remains uncontradicted.

Defendants also attacked the constitutionality of 26 U.S.C. § 4705(a) and 21 U.S.C. § 174 under which they were convicted, but the Supreme Court has subsequently upheld both provisions. Minor v. United States, 396 U.S. 87, 90 S.Ct. 284, 24 L.Ed.2d 283; Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610.

The various rulings of the district judge on defendants' bills of particulars and the court's quashing of Aguirre's subpoenas duces tecum demanding the presence and production of a wide variety of confidential files by various officials of the FBI were well within the discretion of the district court. We have been unimpressed with defendant's attempts to justify these demands, for which no adequate good cause was ever established in the court below.