**UNITED STATES of America**

v.

**Clifford A. JONES.**

**Cr. No. 40–66.**

United States District Court
District of Columbia.

Sept. 30, 1968.

William S. Lynch and Gerald E. Mc-Dowell, Dept. of Justice, Washington, D. C., for the United States.

Edward P. Morgan and Forbes W. Blair, Welch & Morgan, Washington, D. C., for defendant.

## MEMORANDUM OPINION

GESELL, District Judge.

This is a perjury case based on allegedly false statements made before a grand jury in this jurisdiction. Defendant has moved to suppress evidence of certain of his telephone calls and other private conversations that were admittedly intercepted by the Government through various means and under circumstances later to be described. After a full evidentiary hearing on the motion, briefs were exchanged and the issues were argued to the Court. The Court has concluded that the motion to suppress must be granted. The factual background that follows is essential to a consideration of the applicable authorities.

### I.

The facts in this case are not unduly complex. There were three persons whose conversations were monitored by the Government: defendant Jones, Wayne Bromley, and Robert G. Baker. All three were attorneys-at-law. The defendant lived in Las Vegas, Nevada, and the other two men lived in Washington, D. C. They were all well acquainted with each other and had had some business dealings with each other.[1]

---

1. The principal witnesses on this motion were Jones, Bromley, Moore (one of the Government prosecutors), and Sandground (Bromley's attorney). The first two mentioned were parties in interest. Moore was a careful witness and candid, although many facts in the area of his testimony were known by him only secondhand and his account was admittedly spotted with hearsay. Sandground testified after Bromley waived the attorney-client privilege and his testimony has generally been accepted where conflicts in testimony appear.

The course of events begins with Bromley's appearance before a District of Columbia grand jury investigating Baker in October of 1964. The Government considered his replies at that time concerning his relationship with Baker false and he was subpoenaed to appear again in February of 1965. Service of this new subpoena caused Bromley to retain an attorney, Mark Sandground, to advise him.

Sandground immediately met with William O. Bittman and Donald P. Moore, the Government attorneys, in order to postpone Bromley's appearance so that he would have time to determine the extent and nature of the difficulties his client faced and to decide what measures should be taken. The requested postponement was granted. Bittman and Moore, in a series of meetings with Sandground, thereafter discussed possible charges against Bromley. They made it clear that Bromley faced charges of income tax evasion and perjury before the grand jury as well as charges arising out of the whole "Bobby Baker matter." The Government attorneys emphasized the seriousness of these matters and revealed information to suggest the thoroughness of their investigation to date.

Moore and Bittman also told Sandground, who in turn told Bromley, that although they had sufficient evidence against Baker to indict him for tax evasion, they needed help in other Baker matters. It was indicated that Bromley's "cooperation" would be "appreciated" by the Government. Sandground got the message. He considered Bromley a likely defendant and saw "impending disaster" for his client. Sandground advised Bromley that he was in extreme difficulty, that he was a likely candidate for indictment, and that the best course for him to follow was to cooperate fully with the Government attorneys in the hope of some leniency along the way. Bromley decided to do this and thereafter he and Sandground talked with the prosecution six days a week and often twice a day in

different places. These meetings were at Sandground's home, at his office, and at the Department of Justice. At these and subsequent meetings between the Government lawyers and Bromley, no promise was ever made that if Bromley gave evidence against Baker he would not be prosecuted. When immunity was requested for Bromley it was not granted. But it is a fact that Bromley cooperated and that he was never indicted.

On February 23, after numerous meetings with the Government attorneys, Bromley appeared a second time before the grand jury, repudiated his previous testimony, and told what the Government now describes as the "truth." Part of Bromley's story was that Jones knew that Bromley received money from First Western Financial Corp., which he passed on to Baker, keeping none for himself, i. e., he was a conduit for Baker. Later, on March 17, Jones appeared before the grand jury in response to a subpoena duces tecum. He was questioned on a wide variety of matters, including his relationship with Bromley and Baker. During this questioning Jones denied having caused the issuance of checks of First Western Financial Corp. to Bromley as a conduit to Baker. Jones, an officer of First Western, said he knew Bromley as a lobbyist retained by First Western and understood money was to go directly to Bromley for lobbying fees and that part was intended for politicians who could be helpful. None of the money was to go to Baker.

Acceptance of Bromley's contrary version of the conduit facts was very important to him. The payments to Bromley created income tax evasion problems for him unless he could show to the satisfaction of the Government that all the money was intended for someone else and just passed through him as a conduit. In short, to minimize the threat of possible indictment, he had to prove that he was now reliable and that Jones' version was false.

Immediately following his grand jury appearance, Jones returned to his friend Fred Black's office hotel suite at the

Sheraton-Carlton, where he stayed regularly when in town. He recounted to Black's secretary Dee Kaufman, a friend of Bromley, what had occurred before the grand jury. Jones asked her to advise Bromley what he had said about Bromley during his testimony. Jones indicated he did. this because he thought Bromley should know that the grand jury was investigating transactions in which Bromley was involved.[2] A few days later when Jones telephoned Dee Kaufman on another matter she said that Bromley was hurt that Jones had not called him personally to discuss his testimony. This prompted Jones, who lived in Las Vegas, to telephone Bromley in Washington on the evening of March 22.

This call was not monitored by anyone. Although Bromley's recollection is vague, it appears that Jones related to Bromley in more detail the questions and answers that came up before the grand jury. Jones did not know Bromley had been before the grand jury in February and Bromley did not tell him. Significantly, Bromley did not disagree with the version of the payments which Jones said he had given in his testimony before the grand jury. When their conversation ended, neither party apparently expected the other to call back.

Bromley immediately telephoned Sandground and told him that he had had a telephone call from Jones. Sandground apparently felt from information given him by Bromley that Bromley believed Jones was trying to influence Bromley to tell a false story. Indeed, Bromley may have so characterized the call. In any event, Sandground relayed this impression to the Government attorneys. None of the witnesses, other than Jones, could give a detailed account of this call and Jones' account does not support the impressions Sandground got from Bromley.

After Sandground reported the incident to Bittman and Moore, the latter

checked with his immediate superior and then suggested Bromley make a return call to Jones which the Government would monitor. There had been prior conversations concerning monitoring between Sandground and the Government attorneys but this was the first time the Government attorneys decided to follow this dangerous course. The Government attorneys already "believed Bromley absolutely," felt he "could be trusted," and "was on the level"—they accordingly felt justified in using him in an attempt to incriminate Jones as well as to discover if Jones was attempting to obstruct justice and to confirm Bromley's reliability as an informer.

The Court repeatedly pressed for an explanation of the reason for the immediate reaction to Jones' call both by Bromley and the prosecutors. None was obtained. Both Jones and Bromley had testified. Bromley must obviously have been prepared to stick by his version because he reported the call from Jones. He was not in physical danger. Jones had no leverage over him. Bromley cannot explain why he did not disagree with Jones when he heard Jones' version of the transactions. Jones was not a suspect in the Baker inquiry but he had been a perjury suspect in the eyes of the Government from the date of his testimony. Under all these circumstances it cannot be doubted that the Government's primary interest in conducting the subsequent surveillance of conversations between Jones and Bromley was to obtain corroboration of perjury. Indeed, this is not seriously contested by the Government.

Sandground, Moore, Bittman and an employee of a court reporting firm went the same evening to Bromley's home in Maryland. At about midnight, Bromley telephoned Jones on the false pretext that he had not been able to talk earlier because he had had guests. Removal of the mouthpiece from the extension phone

---

2. The Federal Rules of Criminal Procedure do not prohibit or prevent a witness from disclosing the nature, content and extent of his testimony before a grand jury. See Rule 6.

in the kitchen enabled the reporter listening in to take down the conversation between the two participants unbeknownst to Jones. Bromley had first signed a written consent to such monitoring after consulting with Sandground.

Before the conversation started, one of the Government attorneys told Bromley to say to Jones that he had not been before the grand jury. This was wholly false. Bromley did so and continually asked for Jones' guidance as to what he, Bromley, should tell the grand jury. Bromley was persistent in his lying attempts to make Jones incriminate himself, as the following excerpts from the transcript of the interception show:

Mr. Bromley: I said you know—

Mr. Jones: Yes.

Mr. Bromley:—how it was supposed to have been handled, because—Look, as I told you earlier, I haven't actually been before the Grand Jury and I am wondering what I am going to say, if I am called.

Mr. Jones: That is right.

Mr. Bromley: I am getting right disturbed about it, because I haven't talked with—

Mr. Jones: Mm-hm.

Mr. Bromley:—our friend, and I just don't know how[,] you know[,] how this whole thing is going to be handled and it's really got me over a barrel.

Mr. Jones: Well—

Mr. Bromley: Plus the fact that I have to get my returns in less than a month, because last year, as I told you, I didn't get mine in until December 1st and they really haven't had time to check me out on it. And I normally run into trouble and I want to know how to handle this one.

\* \* \* \* \* \*

Mr. Bromley: No, I don't know. I have been under subpoena six weeks or more and I don't know why I haven't been called. \* \* \* There is a bunch that haven't been called yet. I guess they are taking their time getting around to us.

\* \* \* \* \* \*

Mr. Jones: What's that?

Mr. Bromley: I said I would like to bring Bobby with me so we could go over this thing.

\* \* \* \* \* \*

Mr. Jones: There was nobody else present, but the two of us, was there, just the two of us?

Mr. Bromley: Cliff, are you asking me, or are you telling me?

Mr. Jones: I am telling you.

Mr. Bromley: O.K. All right.

Mr. Jones: That part of it—

Mr. Bromley: Yes. O.K.

On the evening of the 23rd, Jones again telephoned Bromley. Jones says he did this to provide Bromley with certain income tax information which had been requested by Bromley in the first intercepted call. This conversation was not monitored. Bromley claims Jones also wanted him to set up a meeting between Bromley, Baker and Jones to discuss Bromley's testimony. Jones denies this and says the idea of a meeting was entirely Bromley's. In any event, Bromley reported his version of this telephone call to the Government attorneys, again through Sandground.

It was decided that Bromley should telephone Jones and Baker and attempt to arrange such a meeting and that the Government should monitor the telephone calls. This was again at the Government's suggestion and with its active encouragement. There were no rules or regulations of the Justice Department covering a matter of this kind. Moore and Bittman researched some of the relevant legal authorities on electronic surveillance. It seemed safe to them to go ahead. Moore and Bittman asked for authority and their superiors authorized further interceptions of phone calls which Bromley was to make.

Bromley, Sandground, Moore and Bittman, along with an FBI agent, were at Sandground's office on March 24. Bromley again signed a written consent to the monitoring of phone calls from him to

Baker and to Jones concerning the proposed meeting. The agent attached to the telephone an induction coil which was connected to a tape recorder in order to record the telephone calls. A series of calls were then monitored on the 24th and 25th, as a result of which a meeting between Bromley, Baker and Jones was arranged for Friday, March 26 in Los Angeles.

After obtaining the authorization of the Attorney General and the formal consent of Bromley for an electronic surveillance of the proposed meeting, further plans for monitoring were made. A transmitter was strapped to Bromley's belly by Government representatives in Sandground's office at Washington on the afternoon of the 26th. He was instructed as to its use. This device could be turned on and off by Bromley as he desired. The Government attorneys suggested that Bromley wear this concealed transmitter to Los Angeles so that he could broadcast the meeting to strategically placed receiving units the Government planned to set up there. The reason this was done in Washington was because Baker was expected to meet Bromley at the airport in Los Angeles.

Later that afternoon Bromley and Sandground flew to Los Angeles. Bromley's flight was paid for, as he had requested, by Jones. The Government paid his other expenses. The Government had asked Sandground to accompany Bromley and reimbursed him for his travel and out-of-pocket expenses. Moore took another flight to Los Angeles, rendezvoused with numerous Government attorneys and agents there, and made plans for monitoring the expected meeting between Bromley and Jones. Nine or ten people participated in the Los Angeles overhearing, including Assistant United States Attorneys and Narcotics Bureau agents. No representative of the FBI was involved.

Baker did not meet Bromley at the airport. The first transmission was a message from Bromley merely stating that he had had the transmitter off and would keep it off until the meeting began.

Later that night at approximately ten o'clock, transmission again began. A conversation between Jones, Bromley and Baker was broadcast from Jones' hotel suite. The three men had withdrawn into the bedroom of Jones' suite leaving behind Baker's female companion in the living room in order to assure their privacy. The subsequent conversation was monitored by the Government agents who had receivers in nearby hotel rooms capable of picking up the signals from the transmitter taped to Bromley's stomach. Unlike the transcripts of the previous interceptions, the transcripts of this surveillance are incomplete due partly to the faulty operation of the broadcasting system itself. Some conversations between Jones and Bromley which occurred after the meeting broke up were not overheard, possibly due to the fact that Bromley had again turned off his transmitter. Jones had no knowledge he was broadcasting through the device or that the Government was overhearing all or part of his conversation with Bromley.

The Government asserts that as far as this indictment is concerned, no significant leads were obtained from any of these monitorings. Nor were these transcripts brought to the attention of the grand jury. Their only use was as a basis for questions asked Bromley upon his subsequent appearance before the grand jury when the indictment of Jones for perjury was considered. The Government's purpose, however, is to offer the intercepted conversations in evidence at Jones' trial through the testimony of its representatives who overheard and transcribed both the various telephone calls and the hotel meeting. The interceptions will be relied on as corroboration of the alleged perjury.

## II.

■ Many different grounds have been urged in support of the motion to suppress. The central and decisive issue, however, is whether Jones' rights under the Fourth Amendment to the Constitution which protects persons against governmental intrusion by unreasonable

searches and seizures were infringed because the Government intercepted certain of his conversations with Bromley. The constitutional requirements applicable to governmental covert interceptions of conversations were recently set forth in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), which reiterated that "the Fourth Amendment governs not only the seizure of tangible items, but extends as well to the recording of oral statements, overheard without any 'technical trespass under * * * local property law.' Silverman v. United States, 365 U.S. 505, 511 [81 S.Ct. 679, 5 L.Ed.2d 734]." 389 U.S. at 353, 88 S.Ct. at 512.

Starting with this unambiguous premise, the holding in Katz, discussed in four different opinions on the majority side and one dissent, must be applied as against the facts in the instant matter. In Katz it appears that agents of the Federal Bureau of Investigation, having probable cause and acting in a circumspect manner but without prior judicial approval, placed an electronic listening device on the outside of a public telephone booth and intercepted telephone conversations which defendant made from the booth to others without the consent of the defendant or any of the other parties to the conversations. The Court rested its decision squarely on the lack of prior judicial control, no warrant having been obtained, and held that on the facts presented antecedent justification before a magistrate was central to a preservation of the Fourth Amendment guarantees. Accordingly, defendant's conviction based on the electronic surveillance was reversed.

■■ The opinions in various ways emphasized that the Fourth Amendment protects people, not places, and that the Amendment is designed to preserve privacy against the "uninvited ear" of governmental intrusion. Governmental interceptions of private conversations without prior judicial control are now per se inadmissible in evidence in a federal court and must be suppressed where timely motions are filed:

Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause,' Agnello v. United States, 269 U.S. 20, 33 [46 S.Ct. 4, 70 L.Ed. 145], for the Constitution requires 'that the deliberate, impartial judgment of a judicial officer * * * be interposed between the citizen and the police * * *.' Wong Sun v. United States, 371 U.S. 471, 481–482 [83 S.Ct. 407, 9 L.Ed.2d 441]. 'Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes,' United States v. Jeffers, 342 U.S. 48, 51 [72 S.Ct. 93, 96 L.Ed. 59], and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.

It is difficult to imagine how any of those exceptions could ever apply to the sort of search and seizure involved in this case. Even electronic surveillance substantially contemporaneous with an individual's arrest could hardly be deemed an 'incident' of that arrest. Nor could the use of electronic surveillance without prior authorization be justified on grounds of 'hot pursuit.' And, of course, the very nature of electronic surveillance precludes its use pursuant to the suspect's consent. Katz v. United States, 389 U.S. 347, 357–358, 88 S.Ct. 507, 514 (1967) (footnotes omitted).

Admittedly, Katz involved governmental interception without the knowledge or consent of any party to the conversations monitored. The Government vigorously argues that in the present case Bromley voluntarily consented and the interceptions took place with his full knowledge and approval, given after consultation with his attorney. Thus it is urged that the rule of Katz is not applicable to consensual surveillance.

■ It should first be noted that the Opinion of the Court in discussing ex-

ceptions to the warrant requirement made no reference to consensual monitoring; in fact the last sentence of the above quotation clearly precludes the existence of any exception for consensual surveillance.[3] Apart from the holding and strong unequivocal language of *Katz*, it is particularly significant in this context that the Court there makes approving reference to Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), with respect to the essentiality of antecedent justification.[4] *Osborn* is a case where a paid Government informer tape recorded conversations between himself and the defendant in order to corroborate his allegation that the defendant was endeavoring to employ him to bribe a prospective juror. In other words, *Osborn* is a case involving monitoring with the consent of one party. However, there was also a prior judicial determination of the reasonableness of the search and seizure of the defendant's statements. It was this latter condition upon which the Supreme Court primarily relied to affirm the conviction in *Osborn* and it was definitely this latter condition upon which the Supreme Court placed its emphasis in *Katz*. Thus any distinction which might be drawn between consensual monitoring and third-party monitoring has no constitutional significance as far as the Fourth Amendment privacy concept is concerned.

■ Assuming for a moment that Bromley may be said to have consented as a matter of law, it is clear he had no authority and did not of course even purport to consent on behalf of Jones, who at all times was wholly ignorant of the Government activities. Under the combined rationale of *Katz* and Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), it is difficult to see how Bromley's conduct, whatever it was in this regard, could possibly have constituted a waiver of the constitutional rights of Jones. Only a magistrate could give the authorization to infringe Jones' Fourth Amendment rights under the circumstances shown by this case. The rationale of *Katz* permits no other conclusion, as both the Seventh Circuit and the Tenth Circuit have since concluded. Doty v. United States, 3 Cr.L.R. 2220 (10th Cir. 1968); United States v. White, 405 F.2d 838 (7th Cir. 1968), petition for rehearing en banc granted.[5]

In holding that the rationale of *Katz* applies in a case where one party to a private conversation consents to the Government's interception of the conversation, the Court does not purport to hold that in fact Bromley voluntarily consented in this instance. Indeed, the contrary appears to be the case. Consent, as a matter of law, means something more than a willingness to cooperate or a formal document expressing consent. Surely a realistic rather than a formalistic meaning of consent is now required where the suggestion is that an exception should be carved out from the stringent, all-embracing constitutional prohibition of *Katz*. Consent must be wholly voluntary in fact and not merely an acquiescence coerced by the constant presence of the Government representatives, coupled with such fearful consequences as Bromley clearly envisaged if he did not go along—indictment, loss of his job, and the eventual foreclosure of the

---

3. There is not unanimity as to the effect of *Katz* in this particular regard. Indeed, Justice White in a footnote to his concurring opinion purported to preserve consensual surveillance against the thrust of the case but the other majority opinions made no reference to the matter and earlier decisions suggesting the contrary appear to have been overruled *sub silentio*.

4. See also Berger v. State of New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

5. Dancy v. United States, 390 F.2d 370 (5th Cir. 1968), takes the opposite view from that of the other two circuits, but the Court has noted the dissent in that case of Fahy, J., sitting by designation from the District of Columbia Circuit.

mortgage on his home.[6] The wise, experienced advice of his attorney, Sandground, given these stark premises, was the advice of necessity which adds nothing to the involuntary nature of Bromley's capitulation. Bromley, required to pass between Scylla and Charybdis, had no choice. The rock and whirlpool were equally dangerous and under the circumstances he could not act voluntarily and give that degree and kind of consent which might otherwise be taken by some to justify an exception to be carved out of *Katz*.[7]

The instant case demonstrates that judicial supervision and control of monitoring is a prerequisite in all situations. Apparently the Department of Justice had no specific written rules governing the circumstances and manner in which surveillance and interceptions of this type could occur. The case was handled by special prosecutors reporting directly to the Assistant Attorney General in charge of the Criminal Division. The agent of the Federal Bureau of Investigation in charge of the Bureau's phase of the inquiry was purposely kept ignorant of the surveillance activities because the prosecutors felt he might have to testify. The Federal Bureau of Investigation was asked to participate in the Los Angeles venture but Mr. Hoover refused. The Department then brought in agents of the Narcotics Bureau of the Treasury Department who were apparently all too eager to experiment with a new electronic gadget which it also appears they did not fully know how to operate. While the special prosecutors obtained formal clearances from their superiors, they ran the show. Under these circumstances it is not surprising that matters got out of hand and the entire experience serves to underline the

wisdom of an all-inclusive rule such as appears to have been laid down in *Katz*.

The monitoring of the various conversations between Bromley and Jones without prior magistrate approval violated the Fourth Amendment and any resulting recordings must necessarily be suppressed.

### III.

This matter should not rest solely on these constitutional principles. Suppression is also necessary for a more immediate and equally essential reason. The Court must invoke its supervisory powers as well to suppress this effort to import manufactured evidence into this case. A member of the bar has been encouraged by the Government to elicit incriminating statements from the defendant in conversations which the Government has made elaborate plans in advance to overhear surreptitiously. This lawyer was persuaded to collaborate with the Government, was given expense money, and asked to induce incriminating statements by lies and use of his special relationship of trust. He was not a neutral bystander. His own involvement with the law depended to some considerable degree upon his ability to "bell the cat."

The Government now says that its overhearings gathered in this fashion should be admitted in proof of the perjury charge against Jones. In good conscience this cannot be permitted. The federal courts have a continuing and exacting responsibility to maintain the highest standards of law enforcement and must not permit the integrity of their fact-finding processes to be demeaned. A breakdown in standards is rare and is apt to arise under the stress of the moment, particularly where the pressures of a major prosecution attracting wide

---

6. See, on the question of voluntary consent, the standards set for this jurisdiction in United States v. Laughlin, 223 F. Supp. 623 (D.D.C.1963) and United States v. Laughlin, 222 F.Supp. 264 (D. D.C.1963).

7. Under this analysis it is immaterial whether the formal consent provisions of the Federal Communications Act, 47

U.S.C. § 605, or newer provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 197, 18 U.S.C. § 2511, enacted subsequent to the indictment, apply in whole or in part. These statutes also depend upon a voluntary consent and in its absence provide no support for the Government's position under the facts of this particular case.

public attention place an undue emphasis upon the necessity of the prosecutors showing results. Unfortunately this appears to be such a case. While the prosecution could not have clearly anticipated the later rulings of the Supreme Court, there is not the slightest excuse for what occurred here in the zeal of the chase.

■ There are, of course, many instances where the Government does and properly should make use of informers. They are an unpleasant but inevitable aspect of law enforcement. When the informer, however, is a member of the bar who stoops to such deceitful conduct at governmental urging and with governmental financial support in an effort to induce unguarded statements from an acquaintance and thus reinforce his own efforts to escape indictment, the Government obviously overreaches.

Evidence so manufactured cannot be admitted in a perjury case for to permit its acceptance would be contrary to elementary standards of fairness. Perjury is an offense which traditionally has had the highest standards of proof to prevent the all too real possibility of a miscarriage of justice which is constantly present in cases of this type. Thus a perjury case is governed by the "two-witness rule" which is expressed in the following standard instruction upheld by a number of cases in this jurisdiction. It reads as follows:

The uncorroborated testimony of a single witness is not sufficient to establish the falsity of the statement of the defendant under oath. If the Government relies on the testimony of a single witness to prove the falsity of the defendant's statement, it must present trustworthy evidence supporting the testimony given by the witness. Unless the Government has proved beyond a reasonable doubt the falsity of the statement of the defendant under oath, corroborated in the manner described, and has proved beyond a reasonable doubt every other essential element of the offense, you must find the defendant not guilty.

When Jones appeared before the grand jury he was asked several questions clearly prearranged and geared to lay the basis for perjury if he contradicted Bromley, who had already testified. Jones testified differently than Bromley. To indict Jones, however, corroboration was needed. The Government made Bromley its agent. The Government interceptions were undertaken at the instance and urging of the Government primarily to get an essential element of proof of the perjury offense, that is, to manufacture corroboration.

■ Whatever may be the proper use of informers in other connections, the Government in a perjury case cannot use someone in a position of trust to invade private areas supported by overhearing devices or techniques in the hope that that person's relationship will enable him by tricks and lies to force the suspect to reveal to the Government's uninvited ear words that may then be said to be suggestive and accordingly put in evidence as an essential element of the offense to be charged.[8] This goes too far. It

8. Numerous cases have been cited by the Government but they do not state the law applicable to this motion. Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), and Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), are not cases involving electronic or telephone interceptions and the informer was allowed to testify. On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952), involved electronic surveillance at a time when the Supreme Court had not held the Fourth Amendment applicable to seizure of words, a result first suggested in Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), and when Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 54, 72 L.Ed. 944 (1928), and its concern with doctrines of trespass, now overruled by Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) was the law. Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), involved use of an electronic device by an acknowledged Government agent who was being offered a bribe and stands on its own special facts. Rathbun v. United States, 355 U.S. 107, 78 S.

borders on entrapment. See Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). None of the cases on which the Government relies involve such a blatant, planned breach of an individual's privacy and trust. Federal courts will lose their independent integrity if they permit the truth-finding process to be undermined by practices such as these which are inherently offensive to the fair administration of justice.

### IV.

In view of the foregoing, a serious question arises as to whether, and, if so, to what extent, Bromley may testify concerning his intercepted conversations with Jones. It is significant that Bromley had no precise recollection of the crucial telephone call from Jones that preceded the first interception. Similarly, when asked about conversations with Jones during the Los Angeles meeting his recollection of the unrecorded portions of the admittedly garbled and incomplete transcript was practically non-existent. Bromley exhibited all of the testimonial characteristics of a cooperating informer who has repeated his tale so frequently that he automatically responds without any true ability to differentiate between the desired version of events and his recollection of the same events. Even under normal circumstances the testimony of an admitted perjurer should be received with caution and scrutinized with care.

While the question of Bromley's credibility is ultimately one for the jury, the Court has the duty to keep from the jury any testimony which is based on Bromley's reliance on the Government interceptions, testimony that is nothing more that a regurgitation of the illegal transcripts themselves. This is particularly

important in this instance because the case against Jones insofar as it rests on the interceptions is based on inference and innuendo. The intercepted statements of Jones are not flatly incriminating and their significance depends largely on other circumstances, the tone used and the complete version and context in which his statements were made.

■ Accordingly, the Court has determined that in the event the Government proposes to interrogate Bromley concerning any of the intercepted conversations, an inquiry should first be held, out of the presence of the jury, to determine whether Bromley's recollection is based in whole or in part on refreshment from or reliance at any time upon the transcripts of the interceptions. Where this is the case, his testimony must then also be suppressed. Bromley is in no different position to this extent than would be the Government representative who listened in while monitoring. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

If there are other fruits of the Government's illegal conduct these must be suppressed but such matters can best be dealt with by evidentiary objections at the trial.

Finally, the Court wishes to make this comment. If, as the Court has concluded, the Fourth Amendment protects the privacy of a citizen against the Government's "uninvited ear," the Government may not use or rely on the transcripts of the words which the Government illegally intercepted and its informer may not use or rely on the transcripts of the words. The decision of the Supreme Court in Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), appears to preserve the right of the in-

Ct. 161, 2 L.Ed.2d 134 (1957), a consensual overhearing case, was not considered in constitutional terms and, in any event, cannot withstand the broad ruling in *Katz*. Obsorn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), as noted previously, has been fa-

vorably referred to in both *Katz* and Berger v. State of New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), with respect to the judicial search warrant issued there; in neither case was consent by one of the parties in *Osborn* mentioned.

former to testify unaided by the transcripts of an illegal governmental monitoring but *Hoffa* preceded *Katz* and it now well may be that an informer like Bromley may not under any circumstances testify concerning conversations which the Government illegally monitored. That issue is reserved for consideration at the time the question of the nature and scope of Bromley's testimony is before the Court. The Court does not wish to determine this at this time since counsel have not had a full opportunity to brief and argue the point.

Accordingly, the Court has concluded that the interceptions in issue in this motion must be suppressed both under the Fourth Amendment to the Constitution and under a discretionary exercise of the Court's supervisory power over the administration of justice. Testimony of Bromley will also be suppressed to the extent indicated.

Submit appropriate order on notice.