**Robert G. BAKER, Appellant**

**v.**

**UNITED STATES of America, Appellee.**

**UNITED STATES of America**

**v.**

**Robert G. BAKER, Appellant.**

**Nos. 21154, 23327.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 3, 1969.

Decided June 30, 1970.

Denied July 29, 1970. Petition for Rehearing in No. 21154.

Mr. Michael E. Tigar, Washington, D. C., with whom Mr. Edward Bennett Williams, Washington, D. C., was on the brief, for appellant.

Mr. Sidney M. Glazer, Atty., Department of Justice, for appellee. Miss Bea-

trice Rosenberg, Atty., Department of Justice, also entered an appearance for appellee.

Before WRIGHT, McGOWAN and ROBINSON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

Appellant Robert G. Baker was convicted in the United States District Court on seven counts of a nine-count indictment charging larceny, income tax evasion, and related offenses. On appeal this court rejected all of appellant's claims of trial court error except two relating to Government eavesdropping, which we did not decide. As to the eavesdropping issues, we held that logs of certain concededly illegal eavesdropping should have been made available to appellant before trial, and we remanded to the District Court to determine, after making them available to the defense, whether these logs tainted the Government's case. At the same time we ordered the trial court to determine whether the prosecution used tainted information in the course of the cross-examination of Baker.[1] On remand the trial court held full and complete hearings on these issues. Its findings of fact and conclusions of law, which we adopt, are included as Appendix A to this opinion. For the reasons discussed below, we now affirm the conviction.

1. Baker v. United States, 131 U.S.App. D.C. 7, 33, 35, 401 F.2d 958, 984, 986 (1968).

2. 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

3. *Id.* at 183, 89 S.Ct. at 972. *Alderman* requires the Government to turn over to the defendant all logs of illegal monitoring which involve "a defendant's own conversations and * * * those which took place on his premises." 394 U.S. at 184, 89 S.Ct. at 972. That much was done here in accordance with the terms of our remand.

4. The remand hearing was not the only opportunity appellant had to challenge the origins of the Government's trial evidence.

**I**

On appeal to this court from the remand hearing, appellant argues that the trial court improperly foreclosed his efforts to trace the subsequent use of the tainted information derived from the illegal taps, the logs of which were furnished appellant pursuant to this court's order. Any discussion of a defendant's rights in relation to logs of illegally monitored conversations must focus on the Supreme Court's recent decision in Alderman v. United States.[2] Once the illegal monitorings have "come to light, [the United States] has the ultimate burden of persuasion to show that its evidence is untainted. But at the same time [the defense] * * * must go forward with specific evidence demonstrating taint." [3]

At the remand hearing the defense did go forward with such specific evidence culled from the logs which had been turned over by the Government. The Government countered by indicating the sources of all questioned evidence which was used at trial. Appellant was allowed to cross-examine the trial attorneys for the Government, the Internal Revenue Service agents who helped in preparing evidence for the trial, and the F.B.I. agents assigned to the case. As a result there was extensive testimony—subject to intensive cross-examination—about the sources of all the possibly tainted information used in the prosecution.[4] Up-

The remand hearing concerned logs of conversations monitored at the offices of Benjamin Sigelbaum in Miami and of Edward Levinson in Las Vegas, and at the hotel suite of Fred Black in Washington, D.C. Other logs from these same sources had been the subject of intensive investigation during a motion to suppress before the trial. At that time appellant had questioned the F.B.I. agents who had done the actual monitoring and their supervisors. In relation to the logs which were turned over prior to trial, this court concluded:

"We have reviewed the record and are satisfied that, as to those records which were turned over to the defense, there was ample warrant for the trial judge's finding that the overheard conversations

on a careful review of the record, we agree with the trial judge that the Government sustained its burden of showing that its evidence was not tainted.[5]

Appellant's more basic contention, however, is that testimony from Government agents can never be sufficient proof to uphold the Government's ultimate burden of persuasion. Appellant argues that he should have been allowed to search through the complete "government files which were used as a basis for investigating and prosecuting the defendant" in order to determine whether any tainted information, obtained directly or indirectly from the illegal taps, was actually used in the prosecution of the case.[6] The Supreme Court in *Alderman,* however, did not sanction such a far-reaching investigation by the defense in every case. It said:

"None of this means that any defendant will have an unlimited license to rummage in the files of the Department of Justice. Armed with the specified records of overheard conversations and with the right to cross-examine the appropriate officials in regard to the connection between those records and the case made against him, a defendant may need or be entitled to nothing else. Whether this is the case or not must be left to the informed discretion, good sense, and fairness of the trial judge. * * * "

394 U.S. at 185, 89 S.Ct. at 973.

We do not believe the trial judge abused his discretion in defining the limits of that inquiry in this case. While the judge did not allow appellant to search the F.B.I. files, he did require the F.B.I. case agents to search their Baker case files to determine whether any tainted information was contained in those files.[7]

had no connection with the matters alleged in the indictment. We find no indication, despite appellant's contention to that effect, that the court improperly limited the scope of the hearing by foreclosing inquiry into the use made of the illegally seized materials. To the contrary, appellant was given every opportunity to question the agents who monitored the devices as well as those who supervised the surveillance, and to trace the 'bugged' material through the F.B.I. files and channels of information. Despite all this, the evidence at the hearing revealed not the slightest connection between appellant's illegally-intercepted conversations and the charges in the indictment. Moreover, the Government introduced evidence, not controverted by appellant, that legitimate independent sources of information gave rise to the indictment and led to the proof supporting the various charges. In short, we think the pretrial hearing was both full and fair, insofar as it related to those logs that had been delivered to the defense."
131 U.S.App.D.C. at 30, 401 F.2d at 981. (Footnote omitted.) That description applies equally well to the hearing on remand.

5. The additional logs which appellant seeks to use to prove taint mentioned the names of Edward Bostick and Eugene Hancock, and the fact that they were associated with certain companies which figured in the prosecution of Baker. The Government demonstrated that its investigation of these individuals was prompted by a civil suit against Baker by Capital Vending. Government agents testified that Ralph Hill, who had signed the civil complaint for Capital Vending, was interviewed by the F.B.I. as a result of the publicity surrounding the suit. Hill disclosed the relationship among Baker, Bostick and Hancock and their respective companies at this interview. As a result of this interview, the F.B.I. opened a Field Office case file on Baker. It was clear from the testimony at the remand hearing that the prosecution's investigation was triggered by this suit and the resulting publicity, not by the illegal taps. The information used at trial derived either from this F.B.I. investigation or from other investigations—such as the Senate hearings—which subsequently inquired into Baker's dealings.

6. We deal with his alternative contention —that the trial court itself should have inspected these records *in camera*—in Note 7, *infra.*

7. While we do not disapprove of the trial judge's decision in this case, we might consider it better practice for the court to make an *in camera* inspection of such files under different circumstances. This case was unusual. There were only three

When the agents disclosed that two excerpts from the logs were found in the files,[8] the judge then allowed further cross-examination in relation to these items. After this testimony, the judge concluded that "neither [item] relate[d] to any of the evidence used by the Government at trial. [The items] were neither made the basis of any investigation or investigative leads in the Baker case, nor disseminated outside the Washington Field Office of the FBI." Giving due consideration to the ample opportunity which appellant had to probe the source of each questioned item, and the Government's exhaustively detailed and plausible account of the independent source for each challenged aspect of the evidence, we find that the trial judge did not abuse his discretion in limiting the inquiry in this manner. We conclude that the evidence used at trial was not tainted.

sources of tainted information. At the original trial the able defense counsel had been able both to question the agents who did the actual monitoring and their supervisors, and to "trace the 'bugged' material through the F.B.I. files and channels of information." In weighing the actions of the trial judge on remand, the scope and rigor of these earlier inquiries concerning similar information from exactly the same sources must be kept in mind.

Because of the extensive inquiry which was permitted in relation to these taps, and because Government witnesses were able to give vivid, detailed accounts of the independent sources of the evidence adduced at trial, we are not prepared to hold that the trial judge abused his discretion by allowing F.B.I. agents to make the investigation and report back to the court under oath, subject to the intensive cross-examination of appellant's trial counsel. However, we do feel that at least in some cases where the wire taps are more widespread, or when it has been impossible to conduct as extensive an examination of those who investigated and prosecuted the case, or when the Government's evidence about its independent sources is not as clear and convincing, inspection of these files by the trial judge might be required.

Furthermore, it seems to us that a court might allow the defense to make its own inspection—subject to the restrictions of

## II

Appellant also contends that the trial judge erred in holding that the information used to cross-examine Baker with regard to a trip to Los Angeles and Las Vegas was derived from an independent source. The trial court allowed a thorough investigation of the Government attorney's story explaining his discovery of the facts he used to cross-examine Baker. The court's findings are set out in detail in Part II of Appendix A. While it seems that both Government counsel were aware of the tainted information prior to the trial, it is clear from the record before us that counsel discovered the conflicting evidence during a routine search of untainted information contained in the files. That search was prompted by defense counsel's outline of his case in his opening statement. The trial court credited Government counsel's

protective orders—in cases where "the trial judge, through lack of time or unfamiliarity with the information contained in and suggested by the materials, will be unable to provide the scrutiny which the Fourth Amendment exclusionary rule demands." Alderman v. United States, *supra* Note 2, 394 U.S. at 184, 89 S.Ct. at 972.

8. The item about Bostick stated:
   "On 2/16/63, the informant later advised that Black did not go to Atlanta but did go to Bowie Racetrack where he apparently met a man referred to by the informant as Eddie. They returned to Washington, D. C., together. Eddie was tentatively identified as one Eddie Bostick (phonetic) who is connected with a company involved in the Appollo (missile project) and is having difficulty with the Navy. The company was not identified. Eddie attempted to interest Black in a matter concerning 'computer' in which a lot of money could be made, however, the informant said Black would not go in on it without Ed (Levinson), that neither he nor Bobby (Baker) goes into anything without taking in 'the Jew boy.' "
   The other item stated:
   "Black's association with Aeronca Manufacturing Corporation, North American Aviation Incorporated, and Melpar Incorporated set out."

testimony, and we see no reason to upset its determination.

We conclude, therefore, that the information used during the cross-examination of Baker was not " 'come at by exploitation of [the illegally monitored conversations but] instead by means sufficiently distinguishable to be purged of the primary taint.' " Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963); *see* Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

### III

During the course of the remand hearing appellant also made a motion for a new trial on the basis of newly discovered evidence offered during the trial of a related case in the District Court. The circumstances surrounding that motion and the conclusions the trial judge reached are recited at length in his opinion denying the motion, which we adopt and include as Appendix B to this opinion.

We agree with the trial judge that no "newly discovered evidence" was presented to the District Court. All of the evidence adduced at the related *Jones* trial[9] was available to appellant before his trial. Indeed, much of it is merely cumulative of evidence introduced at his trial. Even if all the *Jones* evidence as such was not actually available, it could have been discovered from the part that was.

Assuming the *Jones* evidence was newly discovered, we would still find no reason to grant a new trial. First, we do not agree with appellant's contention that Bromley was coerced into allowing the Government to monitor his conversations. Bromley's attorney was a former Government prosecutor, and had advised his client to take the course of action which the attorney felt was least likely to result in a criminal prosecution of Bromley. The mere fact that Bromley allowed the monitoring in the hope that doing so would preclude a criminal prosecution does not of itself vitiate Bromley's consent to the monitoring.

Furthermore, the only monitoring to which Baker could object was that which took place during a meeting of Baker, Bromley and Jones in the Beverly Wilshire Hotel. No physical copies of the transcripts of that conversation were ever introduced in court. Bromley himself testified about the meeting. If Bromley's testimony had been based solely on his independent recollection of that meeting, Baker could not object. Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). However, appellant argues that in effect the transcript of the monitoring was introduced at trial through Bromley's testimony.[10] Assuming that the logs were used in court, Baker cannot object. The Supreme Court has held that it is constitutionally permissible to use monitored transcripts to substantiate the testimony of consenting informers who were parties to the conversations in question. Lopez v. United

9. United States v. Jones, D. D.C., 292 F. Supp. 1001 (1968).

10. In order to refresh his recollection, at trial Bromley was shown part of the transcript of the grand jury proceedings which contained a question the Government attorney had asked him at the grand jury hearing. Appellant asserts that the question, which included a quotation ascribed to Baker, had been taken directly from the log of the monitored conversation in the Beverly Wilshire. While

there is no proof of the assertion in the record before us, it is true that the quotations in the question asked of Bromley at the grand jury proceedings do correspond exactly with portions of the log of the Beverly Wilshire conversation.

Before refreshing his recollection, Bromley had testified that Baker had said he was in trouble for "campaign contributions." After reading the proffered grand jury testimony, Bromley testified that Baker had said he was in trouble for "illegal campaign contributions."

States, 373 U.S. 427, 438–440, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).[11] We conclude, therefore, that the District Court was justified in denying a new trial.

## APPENDIX A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

ROBERT G. BAKER

Criminal No. 39–66
On Remand From
No. 21,154 (United States
Court of Appeals)

---

## FINDINGS OF FACT AND CONCLU-SIONS OF LAW

This case was remanded for further hearings on the defendant's motion to suppress fruits of concededly illegal eavesdropping devices. The remand deals with two separate aspects of the motion to suppress.

First, the Court of Appeals held that the defendant was entitled to inspect the records of all conversations intercepted through the device in the suite of Fred Black in the Sheraton Carlton Hotel in Washington, D. C. At the pre-trial hearing, the defendant had received those logs reflecting his own conversations and those of unknown conversants. The Court of Appeals also permitted the defendant to examine those logs from the devices placed in the offices of Benjamin Sigelbaum in Miami, Florida, and Edward Levinson in Las Vegas, Nevada, which reported conversations with unknown conversants. All such logs have been provided to the defendant.

Second, the Court of Appeals remanded for further consideration the question of whether the monitoring of the telephone call from Baker to Levinson reported in the Las Vegas log on November 1, 1962, tainted the cross-examination of the defendant as to his whereabouts on the weekend on November 2, 1962. If any taint were found, this Court was directed to determine whether it was prejudicial.

This Court held an evidentiary hearing during the week of December 16, 1968. Pursuant to defendant's motion, further testimony was adduced on April 16, 1969. Based on the opinion remanding the case, the record and the hearings held pursuant to the remand, the Court enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. During the relevant period, the Grand Jury investigation concerning the Baker case was in the charge of three Department of Justice attorneys: William O. Bittman, Donald Page Moore, and Austin Mittler. The trial was conducted by Messrs. Bittman and Mittler. Two Internal Revenue Special Agents were assigned to the Baker case in the Fall of 1963: Joseph Rosetti and Donald Iverson; they remained on the case through

11. We are aware, of course, of United States v. White, 7 Cir., 405 F.2d 838 (en banc), cert. granted, 394 U.S. 957, 89 S.Ct. 1305, 22 L.Ed.2d 559 (1969), and that the Supreme Court's decision in that case might shed further light on the continued validity of Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381 (1963), after Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

the trial. The Federal Bureau of Investigation opened its case on October 3, 1963. The case agent in the Washington Field Office from that time until January, 1966, was Paul Kenneth Brown. Agent Brown made investigations as requested by the Department of Justice. These requests were normally in writing.

2. Mr. Bittman was not informed that the defendant's conversations had been picked up by eavesdropping devices until September or October of 1965. The information was supplied as the result of a written inquiry motivated in part by defendant's revelation of the Levinson eavesdropping device before the Senate Rules Committee.

3. The FBI informed Mr. Bittman of the Black, Levinson, and Sigelbaum devices and showed him the basic logs on these devices at FBI Headquarters. He did not make copies or notes. He did not review his Department of Justice files when he returned to his office, and he has no recollection of ever having seen any of the illegally obtained conversations in his prosecution files.

4. Prior to this remand hearing, the defendant had an opportunity to examine all the records of conversations from the Edward Levinson and Benjamin Sigelbaum surveillances in which one of the participants was unidentified.

5. The defendant, in pleadings filed prior to this hearing, selected from these materials four conversations monitored during the course of the Sigelbaum surveillance (on April 18, 1963, February 14 and 19, 1964, and May 20, 1965) and two conversations monitored during the course of the Levinson surveillance (on November 9, 1962, and December 10, 1962) as conversations in which he, the defendant, was the unidentified participant.

6. At the remand hearing the defendant testified that:

(a) He was not the unidentified person in the April 18, 1963, Sigelbaum log, and he was not the unidentified party in the November 9, 1962, Levinson log.

(b) He was the unidentified person in the May 20, 1965, Sigelbaum log.

(c) He might have been the unidentified person in the remaining conversations which he had selected prior to the hearing.

7. With respect to the conversations reflected in 6(b) and 6(c) above, the defendant failed to show at the evidentiary hearing that any of the information contained in those conversations led, directly or indirectly, to any evidence used by the Government at the trial of this case.

8. Prior to this hearing, the defendant had an opportunity to examine all the records of conversations overheard by the FBI during the electronic surveillance of the Sheraton Carlton Hotel suite of Fred Black, Jr.

9. The defendant in pleadings filed prior to the hearing selected from these records eight items which he alleged had some relevance to the trial of the instant case. At the hearing itself, defense counsel was able to indicate only that the names of Edward Bostick and Melpar, Inc., and their relationship to each other, appeared in these records and the same Edward Bostick was a witness called by the Government at the trial of this case.

10. The defendant has made no showing that the items which mention Bostick and Melpar led, directly or indirectly, to the evidence used by the Government at trial.

11. The Baker case files at FBI Headquarters contain no information whatever pertaining to either Bostick or Melpar which emanated from the Black surveillance.

12. The Baker case files of the Washington Field Office of the FBI contain one item relating to Bostick and one item mentioning Melpar, Inc., which did emanate from the Black surveillance. However, neither relates to any of the evidence used by the Government at trial. They were neither made the basis of any investigation or investigative leads in the Baker case, nor disseminated outside the Washington Field Office of the FBI.

13. Both Edward Bostick and Melpar, Inc., first became known to Paul Kenneth Brown, the FBI Baker case agent, on October 3, 1963, during his interview of Ralph Hill—the first interview conducted by the FBI in this case. His interview of Hill was conducted at the specific request of the Criminal Division of the Department of Justice a week prior to the receipt of items from the Black surveillance which mentioned Bostick and Melpar, Inc.

14. Edward Bostick's trial testimony —which included testimony about Melpar—was based upon testimony which he had given in 1964 before the Senate Rules Committee in the course of their hearings into the Baker matter. The content of Bostick's trial testimony conforms in all material respects to his Senate Rules Committee testimony.

## II.

A. *Cross-Examination of Robert G. Baker re November 2, 1962*

15. The Government's chief prosecutor, William O. Bittman, first saw the original log containing the November 1, 1962, overhearing sometime in September, 1965, at the FBI office in Washington, D. C. The FBI had picked up defendant's voice in connection with organized crime investigations.

16. Assistant Government prosecutor Austin S. Mittler first saw the original log containing the November 1, 1962, overhearing by the FBI sometime during 1966 after a motion to suppress had been filed by the defendant.

17. Prior to the hearing on the defendant's motion to suppress, a verbatim copy of the November 1, 1962, log was made available to defense counsel and the Court. During the hearing held in November, 1966, in connection with the defendant's motion to suppress, the conversation of November 1, 1962, became the subject of testimony.

18. The Government first learned on Thursday, January 19, 1967, when defense counsel, Mr. Williams, made his opening statement, that Mr. Baker's defense would, in part, be that he was in Los Angeles, California, on the weekend of November 2, 3, and 4 of 1962; that he returned to Washington, D. C., on November 4; and that on the morning of November 5 he gave to Senator Kerr an envelope containing $16,200.

19. Government counsel then began to review his files to check the authenticity of this representation. On Friday, January 20, 1967, Government counsel, Austin Mittler, found an FBI report which disclosed the existence of a folio card for the defendant at the Beverly Hills Hotel in Los Angeles, California, for November 4, 1962.

20. Government counsel then found the original folio card of the Beverly Hills Hotel in the Government's Documents file.

21. This card indicated on its face that the defendant checked out of the Beverly Hills Hotel in Los Angeles, California, at 8:06 P.M. on November 4, 1962. Defendant could not have been in Washington, D. C., on that date.

22. Neither the FBI report which disclosed the existence of the folio card for the Beverly Hills Hotel nor the folio card of November 4, 1962 (Gov't Ex. 1–A) is tainted. No motion was made at trial to strike that part of the cross-examination which related to Mr. Baker's presence in Los Angeles, California, on November 4, 1962. These documents were obtained routinely by the Government in 1965 during the course of its Grand Jury investigation in this case.

23. After seeing the folio card, Mr. Bittman, chief Government counsel, asked Mr. Mittler to see if he could determine the defendant's whereabouts prior to November 4—specifically on November 2 and November 3.

24. Later that evening, Mr. Mittler found a schedule of telephone calls made by the defendant which reflected that Mr. Baker had made two telephone calls on November 2, 1962, from Las Vegas, Nevada. The telephone schedule had been compiled from untainted sources by the

FBI in 1965 as a part of the Grand Jury investigation in this case.

25. Mr. Mittler showed the November 2 telephone calls to Mr. Bittman, who then requested that someone contact the Sands Hotel in Las Vegas to see whether the Sands had a registration card for Mr. Baker for that date.

26. Mr. Bittman specifically requested the Sands Hotel record because:

(a) The Government had previously obtained hotel records from the Sands which indicated that Mr. Baker had stayed there in April, 1963. These records were untainted, having been obtained routinely during the Grand Jury investigation in this case. In fact, one such record was stipulated into evidence at the trial of this case.

(b) He previously had been told by Wayne Bromley that Baker usually stayed at the Sands Hotel when in Las Vegas, Nevada.

27. That evening, Friday, January 20, 1967, Donald Iverson requested that an Internal Revenue Service agent in Las Vegas, Nevada, go to see whether the Sands Hotel had a registration card for Mr. Baker.

28. Later that evening, Mr. Iverson received a return call from Las Vegas, Nevada, and was told that a record had been found for Mr. Baker at the Sands Hotel in Las Vegas for November 2–4, 1962.

29. Thereafter, Mr. Iverson received a microfilm copy of that record.

30. This exhibit (Gov't Ex. 3) and the Beverly Hills folio card together formed the basis of the cross-examination of Mr. Baker during the trial as to his whereabouts over the weekend of November 2–November 4, 1962. This evidence was untainted.

## CONCLUSIONS OF LAW

Upon consideration of the additional evidence adduced as a result of the remand and the findings heretofore made, the Court concludes:

1. That the Government has established by clear and convincing evidence and beyond a reasonable doubt that it had an independent source for its trial evidence relating to Bostick and Melpar, Inc.;

2. That none of the other conversations revealed by the remand have any relevance to the charges in this indictment; and

3. That none of the items used in the cross-examination of the defendant respecting his Las Vegas trip were tainted. The Government has established by clear and convincing evidence beyond a reasonable doubt that it had an independent source.

The Court's finding that the Government had an independent source makes it unnecessary to deal with the alternate question of whether, assuming the evidence should have been excluded, the corrective instruction was sufficient to cure any potential prejudice. Nevertheless, the Court has considered this issue and concludes that:

(a) The defendant when confronted with evidence that he was in Las Vegas on November 2–4, 1962, rather than in Los Angeles as he had testified on direct, said without hesitancy: "It is entirely possible" and when asked whether he did any gambling responded, "I am sure that I might have. People normally do." Defendant was an unruffled and confident witness. It was brought out that defendant made many trips across the country. It is only about a forty-minute flight from Los Angeles to Las Vegas and that he probably went to Las Vegas from Los Angeles.

(b) The Court granted defendant's motion to strike out of an abundance of caution and to give the defendant the benefit of whatever doubt existed at that time and prior to this evidentiary hearing.

(c) When this brief segment of the trial (the transcript of the testimony is about a page or two out of a total transcript of 3,399 pages) is considered in its

proper perspective, the Court finds defendant could not have been prejudiced by it, for beyond a reasonable doubt it was harmless.

Oliver Gasch
Judge

Date: May 21st 1969

## APPENDIX B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERCIA

v.

ROBERT G. BAKER

Criminal No. 39–66

───────◆───────

### MEMORANDUM

Defendant Baker has moved this Court for a new trial based on newly discovered evidence. He offers as new evidence the suggestion that testimony before another judge in a subsequent trial involving Clifford Jones on charges of perjury indicates that this Court might have been unconsciously misled as to the admissibility of certain testimony in Mr. Baker's case.[1] He then argues that this new evidence is material and requires the granting of a new trial because it brings the facts within the principles set forth in the *Laughlin*[2] case and under the theory of that part of *Katz*[3] which is unaffected by *Desist*[4] (as represented in the *White* decision).[5] The matter was briefed and argued in open Court. Defendant was granted permission to introduce into evidence transcripts of testimony from the case of United States v. Jones.[6] Upon consideration of the briefs, argument, record and exhibits, the Court finds the proffered new evidence to be neither new, nor material and accordingly will deny defendant's motion.[7]

Defendant's position is that Wayne Bromley, a Government witness in this case, did not consent to have his phone conversations with Clifford Jones monitored by the Government. On the contrary, defendant argues, Bromley was coerced by the Government into taking this action and accordingly, the conversations and their fruits should have been suppressed.[8]

During the trial of this case, Mr. Bromley appeared as a witness for the Government and testified that after consulting with his attorney, Mr. Mark Sandground, he decided to cooperate to the extent of requesting the Government to monitor a telephone conversation between him and Clifford Jones. The conversation itself had little or no materiality to the issues in the Baker case. It led, however, to a meeting in the Beverly Wilshire Hotel

1. United States v. Jones, 292 F.Supp. 1001 (D.D.C. September 30, 1968).

2. United States v. Laughlin, 222 F.Supp. 264, 223 F.Supp. 623 (D.D.C. 1963).

3. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

4. Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (March 24, 1969).

5. United States v. White, 405 F.2d 838 (7th Cir. 1969).

6. *Jones, supra,* note 1.

7. Kyle v. United States, 297 F.2d 507, 514 (2d Cir. 1961).

8. United States v. Laughlin, *supra,* note 2.

in Los Angeles between the defendant Baker, Clifford Jones, and Wayne Bromley in March, 1965. On this occasion, Bromley wore an electronic device, placed on him by the Government for the purpose of transmitting conversations within its range to an outside point where they were to have been recorded by the Government. The device malfunctioned and as a result, the recordings were of little or no value.

First, no evidence has been brought to this Court's attention which may in any realistic sense be considered new: at best it is cumulative; in part it is irrelevant; most of it is consistent with that which was presented earlier. Defendant cites several portions of the later testimony but in each instance it is for the purpose of arguing that the circumstances surrounding Bromley's consenting to have his phone monitored were *more* coercive than this Court originally understood.[9] This evidence was in substance either presented to this Court earlier or was implied in that primary information which was presented or is irrelevant to the earlier proceeding.[10] The testimony now referred to is not new.

The main contention of the defense is that only after extensive inquiry during the course of the hearing on the pretrial motions in United States v. Jones[11] did it learn that Bromley's attorney, Mark Sandground, was subjected to intensive pressure by the Government as a result of which he agreed to cooperate and that because of this pressure his cooperation was coerced and therefore involuntary. The Government points out that Sandground could have been called as a witness by the defense in the Baker case and that such action would have disclosed whether or not Sandground would have refused to answer because of the confidential relationship between at-

torney and client. In the absence of such showing, it cannot be presumed that Sandground's testimony would have been unavailable to the defense. The Government also points out that Government counsel adhere to the position previously taken, namely, that there was extensive discussion between them and Sandground as a result of which Sandground in attempting to find out the factual situation with which his client Bromley was confronted did learn much of the Government's evidence, as a result of which he acted in what he considered to be the best interests of his client, offering to have his client cooperate with the Government in the hope that his client would not be indicted. Sandground's subsequent testimony is not in conflict with this position. No promises were made and the fact that cooperation was forthcoming does not make Bromley's action involuntary or bring it within the scope of Judge Youngdahl's opinion in the *Laughlin* case.[12]

That case held that an uncounseled witness could be coerced by circumstances including threats of prosecution into involuntarily aiding the Government. It did not hold that in every situation in which a potential witness might be prosecuted, that witness' awareness of the facts would vitiate his consent. In the instant case, significantly, Bromley is an attorney and was at all times represented by experienced counsel who was a former prosecutor. They made a reasoned decision in light of all the circumstances, that Bromley's best interests would be served by cooperating. There is no indication that Bromley showed any reluctance in reaching that decision, or any regret in having made it.[13]

Second, counsel takes the position that these conversations were material and likely to affect the outcome since they

---

9. But, *compare* Jones Tr. 13–24; 52, 57, 68, 113–14; 300, 301; 344–350; 444–351; *with* Baker Tr. 1130–1131; 31–32. *See* United States v. Baker, 266 F.Supp. 456, 458–459 (D.D.C.1967).

10. *Compare* Baker Tr. 31–32, 1128–1129, 1131, 1134, 1193; *with* Jones Tr. 198,

299–300, 334; 478; Jones Tr. 39; 336–350; Jones Tr. 28–29; 451–452; 448–449; 1129; 1146–1147.

11. *Supra*, note 1.

12. *Supra*, note 2.

13. Baker Tr. 1130–1131.

were utilized to refresh Bromley's recollection before he testified before the Grand Jury and further that Government counsel utilized Bromley's Grand Jury testimony to refresh his recollection concerning his testimony during the trial. Whatever may have been the importance of the Jones-Bromley telephone conversations in the *Jones* case,[14] (it should be noted that those conversations involve the essential issue of corroboration required in a perjury case), here, they were of negligible value and of no evidentiary significance. The phone conversation did lead to the subsequent meeting at the Beverly Wilshire Hotel. But the tap on the conversation did not have any causal connection with the subsequent meeting.[15] The malfunctioning of the electronic device reduced the recording of the conversations to little or no significance. It seems highly questionable to the Court that this fragmentary recording on a malfunctioning electronic device is of any significance compared with the recollection of the witness Bromley himself which was the subject of his Grand Jury testimony shortly thereafter.

In view of the opinion of the Supreme Court in *Desist*,[16] limiting *Katz*[17] to prospective application only, we must look to the state of the law at the time these events happened in the Beverly Wilshire Hotel in 1965. It seems that Baker took the risk of his meeting on that occasion with Bromley and having taken the risk is in no position today to demand a new trial because of his lack of knowledge that Bromley was cooperating with the Government.[18]

Oliver Gasch

Judge

Date: May 29th 1969

14. *Supra,* note 1.

15. Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939). See Baker Tr. at 31–32.

16. *Supra,* note 4.

17. *Supra,* note 3.

18. Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966);

Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Defendant also suggests that if information which was developed in the *Jones* case demonstrates that Bromley did not in fact consent to the monitoring, the Government has violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This suggestion is not supported by the record.